51 F.3d 1329
 63 USLW 2656, Fed. Sec. L. Rep. P 98,668
 Alan J. STRANSKY, Plaintiff-Appellant,
v.
CUMMINS ENGINE COMPANY, INC., Henry B. Schacht, James A.
Henderson, J. Irwin Miller, William I. Miller, George W.
Newlin, William D. Schwab, Harold Brown, Robert J. Darnall,
Hanna H. Gray, Henry L. Hillman, Paul L. Miller, Donald S.
Perkins, William D. Ruckelshaus, and Franklin A. Thomas,
Defendants-Appellees.
 No. 94-1964.
 United States Court of Appeals,
Seventh Circuit.
 Argued Oct. 4, 1994.
Decided April 4, 1995.
As Amended April 7, 1995.
 
 Richard N. Bell, Irwin B. Levin, David J. Cutshaw (argued), Cohen & Malad, Indianapolis, IN, Gene Mesh, Robert Michael Phebus, Mesh & Associates, Cincinnati, OH, for Alan J. Stransky.
 Francis P. Barron, Cravath, Swaine & Moore, New York City, Robert K. Stanley (argued), Kevin M. Toner, Michael R. Maine, Baker & Daniels, Indianapolis, IN, for Cummins Engine Co., Inc., Henry B. Schacht, James A. Henderson, Franklin A. Thomas, George W. Newlin, William D. Schwab, Harold Brown, Robert J. Darnall, Hanna H. Gray, Henry L. Hillman, Jr., Paul L. Miller, Donald S. Perkins and William D. Ruckelshaus.
 David C. Campbell, Bingham, Summers, Welsh & Spilman, Indianapolis, IN, for William I. Miller and Irwin J. Miller.
 Before BAUER, KANNE, and ROVNER, Circuit Judges.*
 KANNE, Circuit Judge.
 
 
 1
 The predicate for this case is a familiar one: a company makes optimistic predictions about future performance, the predictions turn out to be less than prophetic, and shareholders cry foul, or more specifically, fraud. Alan Stransky and Raphael Warkel filed a class action suit against Cummins Engine Company, Inc. (Cummins), alleging securities fraud. The district court dismissed with prejudice, pursuant to Federal Rule of Civil Procedure (FRCP) 12(b)(6), Stransky's claim under the First Amended Complaint (FAC). The court denied, in part, Cummins' motion to dismiss as it related to Warkel. Pursuant to FRCP 54(b), the dismissal of Stransky's claim is final and ready for review. On appeal, we must accept well-pled facts as true and make all reasonable inferences in favor of the non-movant. Propst v. Bitzer, 39 F.3d 148, 154 (7th Cir.1994). We review the district court's decision to dismiss the complaint de novo. Wade v. Hopper, 993 F.2d 1246, 1250 (7th Cir.1993).
 
 
 2
 Cummins is a leading designer and manufacturer of in-line and v-type diesel engines. Because of new emissions standards promulgated by the U.S. Environmental Protection Agency, in 1988 Cummins began producing redesigned engines. Stransky claims that "in internal technical memoranda, Cummins admitted that it had 'rushed' its design and production to comply with the new standards, that there was insufficient time for evaluation of the engines, and that the technical division had relied too much on the testing of prototype hardware rather than on the testing of the final production product." Cummins typically warranted its engines for two years or 100,000 miles, whichever came first.
 
 
 3
 Stransky alleges that beginning in the fall of 1988 and extending through the spring of 1989, Cummins' board of directors was informed that the newly designed engines were experiencing problems due to faulty design and that costs associated with fixing the engines (warranty costs) were rising. Specifically, Stransky alleges the following:
 
 
 4
 20. Warranty claims on these newly designed engines began to come in to the Company fast and furious in late 1988 and early 1989. From January to April of 1989, warranty claims and costs regarding [the newly designed engines] were hundreds of thousands of dollars higher than predicted, higher than planned, and higher than the targets.
 
 
 5
 * * * * * *
 
 
 6
 22. Graphs generated by Cummins' technical personnel reflected dramatic increases in warranty and product costs of the [new engines] as of April 1989.... The warranty claims paid in each of the months of January, February, March and April of 1989 were more than 50% higher than payments made in the same months in 1987 and 1988.
 
 
 7
 23. During the February 12th, 13th, 1989 Board meeting, ... the Director Defendants discussed [the warranty problems] at the meeting as being the biggest problem in the engine business segment of the Company. The Director Defendants also discussed at that February 1989 Board meeting that the Company needed "to reverse the recent trend of rising quality problems."
 
 
 8
 24. On April 3, 1989, or on April 4, 1989, Mr. Schacht reported to the Director Defendants at the April Board meeting that the Company's major concern was with its warranty costs.
 
 
 9
 Of course, to state a securities fraud claim, Stransky must allege fraud. To this end, Stransky alleges that during the fall of 1988, the directors of Cummins became concerned that the Hanson Group (USA) Ltd. (Hanson), a known corporate takeover company, was preparing a hostile takeover. To thwart this effort, the directors conceived a plan known among the directors as "Project Diesel." By March 1989, the directors' research into Hanson indicated that it typically took over companies whose stock was undervalued. As is true in many hostile takeovers, Hanson would fire the company's management and replace them with its own group. Thus, Stransky alleges that in order to entrench themselves against the takeover, the directors plotted to increase the value of Cummins' stock by suppressing the news of the redesigned engines' problems.
 
 
 10
 Mere silence about even material information is not fraudulent absent a duty to speak. Chiarella v. United States, 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980). Stransky alleges that Cummins' silence about the rising warranty costs violated SEC Rule 10b-5 because a duty to disclose the warranty problems arose when Cummins made public statements that related to warranty costs and were misleading because of the withheld information about the problems. If one speaks, he must speak the whole truth. Ackerman v. Schwartz, 947 F.2d 841, 848 (7th Cir.1991).
 
 
 11
 In general, to prevail on a Rule 10b-5 claim, a plaintiff must prove that the defendant: 1) made a misstatement or omission, 2) of material fact, 3) with scienter, 4) in connection with the purchase or sale of securities, 5) upon which the plaintiff relied, and 6) that reliance proximately caused the plaintiff's injury. In re Phillips Petroleum Securities Litigation, 881 F.2d 1236, 1244 (3rd Cir.1989); see also Schlifke v. Seafirst Corp., 866 F.2d 935, 943 (7th Cir.1989). The avenues of proving a false or misleading statement or omission are still uncertain. The most common and obvious method is by demonstrating that the defendant fraudulently made a statement of material fact or omitted a fact necessary to prevent a statement from being misleading. Two other avenues have been kicked around by courts, litigants and academics alike: a "duty to correct" and a "duty to update."[1] Litigants often fail to distinguish between these theories (as did Stransky in this case) and to delineate their exact parameters. The former applies when a company makes a historical statement that, at the time made, the company believed to be true, but as revealed by subsequently discovered information actually was not. The company then must correct the prior statement within a reasonable time. See, e.g., Backman v. Polaroid Corp., 910 F.2d 10, 16-17 (1st Cir.1990).[2]
 
 
 12
 Some have argued that a duty to update arises when a company makes a forward-looking[3] statement--a projection[4]--that because of subsequent events becomes untrue. See, e.g., Backman, 910 F.2d at 17; see also Robert H. Rosenblum, An Issuer's Duty Under Rule 10b-5 to Correct and Update Materially Misleading Statements, 40 CATH.U.L.REV. 289 (1991). This court has never embraced such a theory, and we decline to do so now.
 
 
 13
 Of course, examining the wording of Rule 10b-5 sheds light on the interpretation to be given it. As it relates to this case, Rule 10b-5 states:
 
 
 14
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any national securities exchange, ...
 
 
 15
 (b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. (Emphasis added).
 
 
 16
 The rule implicitly precludes basing liability on circumstances that arise after the speaker makes the statement. In addition, the securities laws typically do not act as a Monday Morning Quarterback. "The securities laws approach matters from an ex ante perspective: just as a statement true when made does not become fraudulent because things unexpectedly go wrong, so a statement materially false when made does not become acceptable because it happens to come true." Pommer v. Medtest Corp., 961 F.2d 620, 623 (7th Cir.1992). These considerations give us serious pause in imposing a duty to update.[5]
 
 
 17
 Courts differ on how they examine forward-looking statements. One method, adopted by the Fourth Circuit, has focused on the requirement that the misleading statement be material. A misleading statement is material for purposes of Rule 10b-5 if there is " 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.' " Basic Inc. v. Levinson, 485 U.S. 224, 231-32, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). In Howard v. Haddad, 962 F.2d 328 (4th Cir.1992), Howard claimed that Haddad induced him, through misrepresentations, to buy stock in a bank that subsequently went under. The alleged misrepresentations were statements by Haddad "that it was a growing bank, and that it was [a] good investment." Id. at 329. The Fourth Circuit held that such "puffery" could not lead to liability because it "lacks the materiality essential to a securities fraud allegation." Id. at 331. In Raab v. General Physics Corp., 4 F.3d 286 (4th Cir.1993), the Fourth Circuit expanded on this rationale by stating, " 'Soft,' 'puffing' statements ... generally lack materiality because the market price of a share is not inflated by vague statements predicting growth.... No reasonable investor would rely on those statements, and they are certainly not specific enough to perpetrate a fraud on the market." Id. at 289-90.[6]
 
 
 18
 While it often may be the case that predictions of growth are not material, we hesitate to impose a per se rule to this effect. The Supreme Court has cautioned that materiality is typically an issue to be resolved by the finder of fact. TSC Indus., Inc., 426 U.S. at 450, 96 S.Ct. at 2133; see also Rowe v. Maremont Corp., 850 F.2d 1226, 1234 (7th Cir.1988). A blanket rule that forward-looking statements are not material does not allow for the contextual, fact-specific nature of the inquiry and would potentially allow companies to engage in conjecture with impunity.
 
 
 19
 Moreover, current SEC policy contradicts the rationale that investors do not rely at all on projections. Until the late 1970s, SEC policy forbade companies from making forward-looking statements in mandatory disclosure documents. After years of study and public comment, in 1978 the SEC reversed itself and adopted a policy that encouraged disclosure of management projections. A main reason for the change in policy was that the SEC realized that:
 
 
 20
 projections are currently widespread in the securities markets and are relied upon in the investment process. Persons invest with the future in mind and the market value of a security reflects the judgments of investors about the future economic performance of the issuer. Thus projections are sought by all investors, whether institutional or individual.
 
 
 21
 Disclosure of Projections of Future Economic Performance, Securities Act Release No. 5362 [1972-73 Transfer Binder] Fed.Sec.L.Rep. (CCH) p. 79,211, 82,667 (Feb. 2, 1973).[7]
 
 
 22
 Another avenue of analysis is available. In Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991), the Supreme Court held that statements by a board of directors of reasons for taking action and statements of present opinion or belief are statements "with respect to ... material fact[s]" within the meaning of SEC Rule 14(a)-9. The Court reasoned that, "[s]uch statements are factual in two senses: as statements that the directors do act for the reasons given or hold the belief stated and as statements about the subject matter of the reason or belief expressed." Id., 501 U.S. at 1092, 111 S.Ct. at 2758.
 
 
 23
 Applying this framework to forward-looking statements, in Kowal v. MCI Communications Corp., 16 F.3d 1271 (D.C.Cir.1994), the D.C. Circuit stated that the "only truly factual elements involved in a projection are the implicit representations that the statements are made in good faith and with a reasonable basis." Id. at 1277 (internal quotations and citations omitted). We believe this is correct.[8] This analysis remains true to the wording of the rule, as well as limiting liability to the small number of statements that are most harmful in the marketplace. Thus, a projection can lead to liability under Rule 10b-5 only if it was not made in good faith or was made without a reasonable basis. With this discussion in mind, we turn to the facts of the case before us.[9]
 
 
 24
 The district court apparently gleaned only a duty to update theory from the complaint and Stransky's briefs. The district court (following Stransky's lead) did not label Stransky's claim a duty to update, but rather a "duty to supplement." The district court stated, however, that Stransky's theory applies only to forward-looking statements, and this coincides with the duty to update. The district court dismissed that claim because it believed that the information that Cummins later discovered, that warranty costs were rising, was not within the scope of the statements made, and therefore Cummins had no duty to reveal the information. In other words, the information concerning rising warranty costs could not render the statements false. Stransky argues to this court that his complaint contains alternative theories of liability, as allowed by the Federal Rules, see FED.R.CIV.P. 8(a): a claim that the statements were misleading and fraudulent when made, as well as a vaguely defined theory that Cummins had a duty to "make additional disclosures." He did so, presumably, because the facts, as unveiled during discovery, might have shown that the statements were true (or at least Cummins was not reckless in not knowing they were false) when made, but that Cummins received information after they released the statements that made the statements misleading. Under this set of facts Cummins arguably would have had a duty to make additional disclosures. On the other hand, he might have discovered that Cummins fraudulently made the statements, in which case he would rely on the more typical fraud theory.
 
 
 25
 We first look to the complaint to determine whether Stransky has alleged facts that, if true, could lead to Rule 10b-5 liability under any theory. The complaint, as it relates to Stransky, alleges that four press releases lead to liability. We will examine each to determine whether it alleges facts sufficient to support any of the three theories described above. The complaint alleges the following concerning the two February statements:
 
 
 26
 41. On February 7, 1989, Cummins, with the approval or acquiescence of the Director Defendants, issued a press release indicating that engine orders remained strong and that shipments of B & C engines were expected to increase by 25%. The press release further stated that 1989 will be a much improved year due to the strength of Cummins' major market, price increases, work force reductions, improved margins, and efficiency from plant consolidations.
 
 
 27
 42. On February 28, 1989, the Company, with the approval or acquiescence of the Director Defendants, issued a press release to the effect that it expects earning per share in the First Quarter to exceed $1.00 and that 1989 should be a much improved year, which press release was adapted from a presentation by Mr. Schacht and by Mr. Henderson.
 
 
 28
 Nothing in these press releases related directly to warranty costs, and therefore Stransky cannot rely on them for alleging that Cummins violated Rule 10b-5. See Backman, 910 F.2d at 17.
 
 
 29
 Stransky also alleges that two April press releases can support liability. The complaint alleges the following about an April 4, 1989 press release.
 
 
 30
 43. [The press release] indicated that Cummins expected its First Quarter earnings to exceed $1.50 per share and that Second Quarter results were expected to be stronger than the First Quarter. The press release further stated that the shift by the Company to sales of their new engines had a dramatic influence on profitability since each of these products were coming down on their cost curves and were making progress toward their targets. As set forth above, however, the new engines were, in fact, beginning to show design defects and increased product and warranty costs from January to April of 1989.
 
 
 31
 Stransky admits in the next paragraph of the complaint that Cummins' expectations about First Quarter earnings were correct, and therefore the statement concerning earnings per share cannot lead to liability. However, the press release also made two historical statements that may relate to warranty costs: that the engines "were coming down on their cost curves," and that the engines "were making progress toward their targets." These statements, at least as represented in the complaint, are ambiguous. We can think of at least four ways in which "cost curves" can be interpreted. It could refer to only production costs, as the district court seems to have concluded, in which case warranty costs would indeed be unrelated. On the other hand, it could refer to overall costs of a product, which conceivably, although not necessarily, include warranty costs. If warranty costs were rising so precipitously as to outweigh the decrease in other costs, thereby causing overall costs to rise, the statement could be false. Additionally, "cost curves" was stated in the plural; this could lead to two additional interpretations. One can imagine a company breaking up its overall cost curve into its derivative costs (i.e., raw materials, labor, marketing, warranty, among others) and charting and following these more particularized costs. Thus, "cost curves" could have referred to each of these derivative costs. However, the plural could have stemmed from the press releases' discussion of multiple products. The statement is unclear. What is clear is that on a motion to dismiss we should make all reasonable inferences in favor of Stransky and should not resolve the interpretation of the press release against Stransky. Similarly, if Cummins had "targets" for its warranty costs, as suggested in the complaint,[10] then the fact that warranty costs were rising could make incorrect the statement that the engines were making progress toward their targets.
 
 
 32
 The complaint also recounts an April 20, 1989 press release that "indicated that B & C engines were now profitable and that profit margins on these engines should improve as the costs of these engines continued to decline." This statement appears to contain one historical statement, that the costs of the engines are now declining, and two predictions, 1) that profit margins should improve, and 2) that the costs of the engines should decline from current levels. The analysis of the historical statement alleged here follows that set out above and will not be repeated. The forward-looking statements can lead to liability only if they were unreasonable in light of the facts known at the time (and such unreasonableness was due to rising warranty costs as Stransky has alleged no other reason) or they were not made in good faith. We must remand to the district court for further resolution of these issues.
 
 
 33
 As to Stransky's purported theory that the statements were fraudulent when made, even if the complaint would sustain this theory, it must have been presented to the district court. The district court stated that Stransky did not present the argument until his Motion to Reconsider. Stransky correctly states that his complaint need not contain the legal predicate for his claim. See Teumer v. General Motors Corp., 34 F.3d 542, 545 (7th Cir.1994). However, when presented with a motion to dismiss, the non-moving party must proffer some legal basis to support his cause of action. See id. at 545-46. The federal courts will not invent legal arguments for litigants. Stransky claims that he presented alternative legal theories of liability, one being that the statements were fraudulent when made, in his response to Cummins' motion to dismiss.
 
 
 34
 Such a strategy would have been astute had Stransky devised it prior to the district court's September 13, 1993 order dismissing his claim. Unfortunately for him, Stransky did not conceive this idea until his "Motion to Reconsider," ten days later. Until that time, the only theory of liability that Stransky claimed was that as of May 1, 1989, Cummins had a duty to update previous statements (that had become misleading since made).
 
 
 35
 A number of factors lead us to this conclusion. First and foremost, Stransky defined the class of people that he was to represent as those persons buying Cummins stock after May 1. Had he been arguing that the pre-May 1 statements were fraudulent when made, the class period would have begun as of the time of the earliest statement that was fraudulent when made. Even under a strategy of alternative theories of liability, one would have expected Stransky to declare that the class period may begin earlier if the April statements were fraudulent when made. Stransky made no such statement. Second, nowhere in his complaint or briefs to the district court did Stransky set out his argument as being in the alternative. We do not think it is too burdensome for counsel to clearly separate the legal theories relied on. Third, the sole reason for certifying Stransky as a class representative was to represent a class of plaintiffs on the duty to supplement theory of liability. Warkel was the class representative for the plaintiffs relying on the theory of liability that statements were fraudulent when made. Stransky's purpose as a class representative was as a plaintiff who had bought stock before Cummins made any affirmative fraudulent statements but after Cummins had a duty to supplement previous statements that had become misleading.
 
 
 36
 Stransky doubtless presented this argument to the district court in his FRCP 59(e) motion. But as we continue to stress, we will not find that a district court has abused its discretion under Rule 59(e) simply because it declined to allow a plaintiff to present a new legal theory. King v. Cooke, 26 F.3d 720, 726 (7th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1373, 131 L.Ed.2d 228 (1995).
 
 
 37
 Therefore, Stransky has forfeited the legal argument that the statements were fraudulent when made. Although Stransky did not differentiate between a duty to update and a duty to correct, because of the confused state of the law in the area, we find that he has not forfeited either argument. He may continue on the theory that Cummins had a duty to correct within a reasonable time, as it relates to the historical statements in paragraphs 43 and 44 of the FAC. He may additionally continue on the claim that the predictions in paragraph 44 were unreasonable when made or were not made in good faith. We AFFIRM in part, REVERSE in part, and REMAND for further consideration consistent with this opinion.
 
 
 
 *
 Due to a conflict that was discovered on April 4, 1995, Judge Rovner is recused from this appeal. The conflict arose on March 30, 1995, after the final decision in this case had been sent to the printer but before the decision was issued. The April 4, 1995 opinion stands as a decision of a majority of the panel
 
 
 [1]
 The Supreme Court has not addressed either duty. In fact, the Court affirmatively declined to discuss the question of liability for projections in Basic Inc. v. Levinson, 485 U.S. 224, 232 n. 9, 108 S.Ct. 978, 984 n. 9, 99 L.Ed.2d 194 (1988)
 
 
 [2]
 Cummins does not dispute the viability of this theory
 
 
 [3]
 No duty to update an historical statement can logically exist. By definition an historical statement is addressing only matters at the time of the statement. Thus, that circumstances subsequently change cannot render an historical statement false or misleading. Absent a duty to speak, a company cannot commit fraud by failing to disclose changed circumstances, with respect to an historical statement
 
 
 [4]
 As Stransky contests only statements that were predictions or projections about the performance of Cummins' products, we limit our analysis to whether a duty to update such predictions exists. We express no opinion on whether the outcome would be the same if a plaintiff contested statements of intent to take a certain action
 
 
 [5]
 SEC Rule 175 provides a safe harbor for forward-looking statements contained in certain documents that are filed with the SEC. The SEC is currently considering expanding the safe harbor to include forward-looking statements in non-filed statements. See Safe Harbor for Forward-Looking Statements, 57 SEC Docket 1999 (October 13, 1994)
 
 
 [6]
 Other circuits have similarly held that predictions about future performance are not material under Rule 10b-5. See, e.g., Krim v. BancTexas Group, Inc., 989 F.2d 1435, 1446 (5th Cir.1993); Friedman v. Mohasco Corp., 929 F.2d 77, 79 (2nd Cir.1991)
 
 
 [7]
 For a fuller discussion of the SEC's policy change see Bruce A. Hiler, The SEC and the Courts' Approach to Disclosure of Earnings Projections, Asset Appraisals, and Other Soft Information: Old Problems, Changing Views, 46 MD.L.REV. 1114 (1987)
 
 
 [8]
 In dicta this court has stated that predictions that don't pan out can lead to Rule 10b-5 liability only if the prediction was unreasonable in light of the information available at the time the statement was made. Eckstein v. Balcor Film Investors, 8 F.3d 1121, 1132 (7th Cir.1993). As precedent for this position, we relied on cases discussing the safe-harbor provisions found in the SEC's Rule 175 for forward-looking statements. Rule 175, strictly speaking, is not applicable to our case, because the purportedly fraudulent statements were not "filed with the Commission," as the rule requires, but rather were contained in press releases
 
 
 [9]
 We note that although we hold that a company has no duty to update forward-looking statements merely because changing circumstances have proven them wrong, a company can limit its liability by "updating" a prediction that was unreasonable when made or made in bad faith
 
 
 [10]
 Stransky's complaint earlier alleges, "From January to April of 1989, warranty claims and costs regarding the [redesigned engines] were hundreds of thousands of dollars higher than predicted, higher than planned, and higher than the targets." (Emphasis added)