Darrell B. SEARLS, on behalf of himself and all others similarly situated, Plaintiff–Appellant,

v.

James J. GLASSER, et al., Defendants–Appellees.

No. 94–3572.

United States Court of Appeals, Seventh Circuit.

Argued May 15, 1995.

Decided Aug. 30, 1995.

1062

Kristi L. Browne, Lawrence Walner, Walner & Associates, Chicago, IL, Jerome Congress (argued), Michael C. Spencer, Keith M. Fleischman, Milberg, Weiss, Bershad, Hynes

& Lerach, New York City, Lisa I. Vessey, Chicago, IL, for plaintiff-appellant.

Caryn L. Jacobs, Asst. U.S. Atty., Michele Odorizzi (argued), Robert J. Kriss, Scott J. Davis, Herbert L. Zarov, Alan N. Salpeter, Leland H. Chait, Rosaria V. Owen, Mayer, Brown & Platt, Chicago, IL, for defendants-appellees.

Before CUMMINGS, BAUER, and ROVNER, Circuit Judges.

BAUER, Circuit Judge.

Darrell Searls filed this class action against officers of GATX Corporation, alleging claims arising under the Securities Exchange Act of 1934 ("Act"), 15 U.S.C. §§ 78j(b), 78t(a), as well as under state common law. The district court granted the defendants' motion for summary judgment. Searls appeals; we affirm.

GATX is a Chicago-based holding company consisting of five subsidiaries which engage in a variety of diverse operations. GATX's second largest subsidiary, GATX Capital ("Capital"), buys and then leases aircraft and railcars. At the end of a given lease, Capital will often sell the equipment at a price in excess of the equipment's book value. The profit realized from such a sale is referred to as a "disposition gain." Along with lease payments, disposition gains play significant roles in Capital's and, in turn, GATX's success.

From 1987 to 1990, GATX's financial performance was stellar. It posted earnings consistently surpassing those of the previous year. The trend culminated in January 1991, when GATX announced that its 1990 net income was a record $82.9 million. Despite a slumping global and U.S. economy, James Glasser, GATX's Chief Executive Officer, maintained that GATX would be able to sustain "modest growth" through 1991. Glasser said:

> We talk about ourselves being recession-resistant.... As of December 31, 1990, we will have future noncancellable rentals in excess of two billion dollars, and that really provides us with a cushion.
>
> Disposition gains represent an important and ongoing portion of our income stream. In 1990, we had another record year of disposition gains. Our investment in high-quality assets will continue to support a high level of disposition gains as we continue to purchase new assets and sell off mature assets.

Glasser reiterated this sentiment in a letter to shareholders which accompanied the 1990 annual report. He wrote:

> We are optimistic about our company's ability to continue its momentum during 1991. As a result of the changes made to our capital structure and the long-term nature of our lease contracts, we are well positioned defensively in the current recessionary economy.... We see long-term benefits in the form of increased revenues, cash flow, and profits from all five segments as we proceed through the 1990s.

Around the time the letter and report were sent to shareholders, GATX was in the process of ratifying its five-year budget for the years 1991–1995. The budget predicted only a small increase in net income for 1991, but concluded that the rate of growth would rise sharply from 1992 to 1995.[1] Also acknowledged in the budget was that, because Capital had fewer assets coming off leases, disposition gains would drop from $40 million in 1991 to $14.4 million in 1992.

By the end of the third quarter of 1991, GATX's net income had exceeded that earned after three quarters one year earlier. Glasser again lauded GATX's ability to withstand recessionary pressures stating, "GATX's first half earnings reflect the recession-resistant characteristics of GATX's operating companies supported by long-term assets on long-term leases." At around the same time, three of GATX's senior managers exercised their stock appreciation rights ("SARs"). SARs are issued to senior GATX officers as part of their compensation. They are not unlike stock options in that they

---

1. The budget anticipated net income as follows:

1991—$85.8 million
1992—$96.0 million
1993—$111.8 million
1994—$134.8 million
1995—$144.6 million

entitle the holder to a cash or stock payment in an amount representing the difference between the market price and the strike price specified on the face of the SAR. For purposes of this opinion, the significance of the SAR is that its value rises and falls with the stock price. These transactions became an issue in the consequent litigation.

In September of 1991, GATX began investigating the possibility of purchasing additional assets the financing of which would require GATX to issue additional equity. In an effort to gauge the wisdom of such a move, Glasser met with the head of each of the five subsidiaries and asked them to provide him with a forecast of each subsidiary's 1992 performance.

On September 23, 1991, Ronald Zech, Capital's President, informed Glasser that Capital's net income would be $12.1 million lower than that estimated in the budget. Three other subsidiaries reported projections which, when combined, fell $13 million below the net income predicted in the budget. When losses at the holding company level were thrown into the mix, GATX was looking at a net income of $67.7 million instead of the $96 million forecast in the budget.

Because analysts were projecting big things for GATX in 1992, Glasser went public with the new figures:

> GATX's long-term leases to quality customers stabilize our cash flow and earnings even as the industries we serve are affected by the current economic slowdown. Although GATX is reporting record nine month earnings as a result of these recession-resistant characteristics, we anticipate that 1992 earnings will fall below this year's. We do not view this as having any effect on GATX's excellent long-term growth prospects. Next year, GATX has fewer assets coming off lease which in turn will generate lower disposition gains. Additionally, we are experiencing pressure on new and renewal aircraft lease rates. Lastly, rate increases currently obtainable on rail equipment likely will not offset increased maintenance and repair costs.

Glasser's announcement caused GATX's stock to fall from $37.63 per share to $29.38 per share. Eight days later, the plaintiffs filed this suit. The plaintiff class consists of all persons who purchased GATX stock between January 23, 1991 and October 17, 1991, the date of Glasser's announcement. Their lawsuit contends that the defendants had knowledge of the 1992 downturn well in advance of when they eventually published this information. The plaintiffs charge the defendants with deliberately misleading investors into believing that GATX's future was more promising than they knew it would be.

In a thorough and well-reasoned opinion, the district court granted the defendants' motion for summary judgment finding that the plaintiffs' allegations, even if fully supported, fail to point to actionable misrepresentations on the part of the defendants. Plaintiffs appeal this decision and contest the district court's discovery rulings.

■ Summary judgment shall be granted if the pleadings along with the supporting documents "show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). We review a district court's grant of summary judgment using the same standard after viewing the evidence and drawing all inferences in a light most favorable to the nonmoving party. *CSX Transp., Inc. v. Chicago & North Western Transp. Co., Inc.*, 62 F.3d 185, 188 (7th Cir. 1995).

■ To establish liability under § 10(b) of the Act, 15 U.S.C. § 77j(b), or Securities and Exchange Commission Rule 10(b)(5), 17 C.F.R. § 240.10b–5, one must prove that in connection with a securities transaction, the defendant either made a false statement of material fact or failed to make a statement of material fact thereby rendering the statements which were in fact made misleading. The plaintiff must then show that the misleading statement caused an injury. Whether a statement is material depends on how it

affects an investor's perception of the security. If the court determines that there is a substantial likelihood that disclosure of the information would have been viewed by the reasonable investor to have significantly altered the total mix of information, the statement is material. *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988). Not surprisingly, this determination is a highly fact-dependent analysis. The plaintiff must also demonstrate that the deceit was committed with the intent to mislead or at least with recklessness so severe that it is the functional equivalent of intent. *Ambrosino v. Rodman & Renshaw, Inc.,* 972 F.2d 776, 789 (7th Cir. 1992); *Sundstrand Corp. v. Sun Chem. Corp.,* 553 F.2d 1033, 1045 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 224, 225, 54 L.Ed.2d 155 (1977).

■ One consequence of this construction is that predictions and forecasts which are not of the type subject to objective verification are rarely actionable under § 10(b) and Rule 10b–5. *Eckstein v. Balcor Film Investors,* 8 F.3d 1121, 1132 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 883, 127 L.Ed.2d 78 (1994). "[A]n inability to foresee the future does not constitute fraud, because '[t]he securities laws approach matters from an *ex ante* perspective'." *Id.* (citations omitted). Therefore, as long as those statements had a reasonable basis when made, they do not constitute fraud. *Wielgos v. Commonwealth Edison Co.,* 892 F.2d 509, 513 (7th Cir.1989).

Plaintiffs allege that during the class period, Glasser repeatedly characterized GATX as "recession-resistant," despite the fact that he knew that GATX was not resisting the recession. Additionally, Glasser consistently represented that GATX would maintain a "high" level of disposition gains which plaintiffs contend that he knew to be untrue. These two classes of misrepresentations form the basis of plaintiffs' appeal. They add that the fact that Glasser and other officers exercised their SARs during the class period and converted them to cash is evidence of fraudulent intent and bad faith.

■ We begin our analysis by considering Glasser's statements about GATX's recession-resistant qualities. We believe that they cannot form the basis of a fraud claim for at least two reasons.

First, the phrase "recession-resistant" is simply too vague to constitute a material statement of fact. Plaintiffs apparently interpret the phrase to mean "recession-proof." But it could be just as easily used to describe a company that although not impervious to the effects of a recession will nevertheless survive it better than others. It is a promotional phrase used to champion the company but is devoid of any substantive information. Just as indefinite predictions of "growth" are better described as puffery rather than as material statements of fact, *see Stransky v. Cummins Engine Co., Inc.,* 51 F.3d 1329, 1333 (7th Cir.1995) (discussing cases in the Fourth Circuit in which vague promotional statements are deemed not material), describing a company as "recession-resistant" lacks the requisite specificity to be considered anything but optimistic rhetoric. Its lack of specificity precludes it from being deemed material; it contains no useful information upon which a reasonable investor would base a decision to invest.

■ Moreover, a thorough review of those representations reveals that Glasser's statements were observations about his company's strength at that time rather than firm predictions for the future; observations for which Glasser certainly had a reasonable basis. GATX posted record earnings in 1990 only to surpass those in 1991, a performance which flew in the face of the recession that had plagued the U.S. economy since 1990.

Plaintiffs counter by pointing to the ongoing problems afflicting the airline industry— the bankruptcy of Pan–American Airlines, the shut-down of Eastern Airlines, and the loan default of Trans World Airlines being the foremost examples—and contend that given Glasser's awareness that these problems could adversely affect GATX's business, his "recession-resistant" statements were not reasonably based. Correspondence between Zech and Glasser confirms that there was concern about the problems in the airline industry. That correspondence also reveals, however, that the concern was for the impact

these events might have on 1991 earnings, which, despite the predicaments faced by the airlines, continued to grow. In this respect, GATX's demonstrated ability to overcome this adversity provided further support for Glasser's observations.

Plaintiffs' claim pertaining to Glasser's statements about disposition gains presents a similar question. In 1991, GATX realized extraordinary profits from the disposition of its assets: over $50 million. Nevertheless, as is evident from its budget, GATX's management expected this figure to fall back to more modest levels as fewer assets came off leases: $14.4 million in 1992, $12 million in 1993, and $16 million in 1994. In February and September of 1991, Glasser assured investors that disposition gains would be "high." Plaintiffs contend that in light of the budget, these assurances were deliberate misrepresentations.

■ These statements are also best characterized as loose predictions and as such are not actionable. In *Raab v. General Physics Corp.*, 4 F.3d 286, 290 (4th Cir.1993), the Fourth Circuit held that a projection of annual growth in the range of "10% to 30% over the next several years" could not support a claim for securities fraud because it was too vague. Because the range of rates and the period over which the growth was to occur were not at all definite, the court held that the projection was not of the kind relied upon by a reasonable investor. *Id.; see also Hillson Partners Ltd. Partnership v. Adage, Inc.*, 42 F.3d 204, 212 (4th Cir.1994) (deeming prediction of "significant sales gains ... as the year progresses" too vague to be material); *In re Browning–Ferris Indus. Inc. Sec. Litigation*, 876 F.Supp. 870, 897 (S.D.Tex. 1995) (holding that statements predicting growth but "not worded as guarantees, are not actionable under the federal securities laws"); *Cione v. Gorr*, 843 F.Supp. 1199, 1205 (N.D.Ohio 1994) (holding that representations such as "[we] anticipate continued strong demand for tire products" and "opportunities should expand" fail to contain information of the requisite specificity or indicia of probability such that a reasonable investor would rely on them).

We find that similar reasoning applies here. Measured against this standard, predictions of "high" disposition gains cannot be held sufficiently definite so as to constitute material misstatements of fact. It is even less definite than the statement at issue in *Raab*. Portraying disposition gains as "high" is of no help to an investor. Does it mean high relative to the previous year or the previous few years? Or does it mean high relative to revenues as a whole? How far into the future does it extend? It is simply too vague a description to affect the mix of more detailed information upon which a reasonable investor typically relies.

■ Furthermore, plaintiffs' argument attaches too much significance to the five-year budget. The projections contained in the budget were tentative and were prepared for the benefit of GATX's management to assist it in formulating their long-run strategy. The figures were subject to continual revision as GATX's subsidiaries submitted "rolling forecasts" not unlike that which precipitated Glasser's October 17 announcement. Before management releases estimates to the public, it must ensure that the information is reasonably certain. *Wielgos*, 892 F.2d at 516; *Panter v. Marshall Field & Co.*, 646 F.2d 271, 292 (7th Cir.), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981). If it discloses the information before it is convinced of its certainty, management faces the prospect of liability. *Id.* at 293.

In *Panter*, despite being aware of estimates contained in a similar five-year plan which predicted a drop in net income of seven percent, Marshall Field's management issued a letter citing an anticipated increase in net income of thirteen percent. When net income dropped by almost twenty-five percent, the shareholders filed a class action. We held that when they were made, the projections in the five-year estimate were too tentative and uncertain to be published and, therefore, failed to render the published statements unreasonable in their bases. *Id.* GATX's budget was similarly tentative. Disposition gains were difficult to predict as is evidenced by what actually happened in 1992 and 1993. Even though the budget anticipated disposition gains of $14.4 million and $12

million in 1992 and 1993 respectively, Capital realized disposition gains of $22 million in 1992 and $43 million through three quarters of 1993. These discrepancies were fairly typical, and GATX's management knew from experience that the budget's forecast was by no means certain. For that reason, we cannot say that the budget's estimates rendered Glasser's characterization reckless.

A final point merits response before we move on to the alleged discovery errors. Plaintiffs maintain on appeal as they did before the district court that the defendants' conversion of their SARs into cash created an inference of bad faith and fraudulent intent.

■ In some cases, an insider's suspicious sale of holdings followed by the publication of material adverse information may support an inference of bad faith and scienter. *Freeman v. Decio,* 584 F.2d 186, 197 n. 44 (7th Cir.1978); *In re Apple Computer Sec. Litigation,* 886 F.2d 1109, 1117 (9th Cir. 1989), *cert. denied,* 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990). That inference may be rebutted, however, by information which provides a legitimate reason for the sale. *Freeman,* 584 F.2d at 197 n. 44. The summary judgment burden then shifts back to the plaintiffs to produce additional evidence of scienter. *Id.; In re Browning–Ferris Indus. Inc. Sec. Litigation,* 876 F.Supp. 870, 910 (S.D.Tex.1995).

■ In this case, the defendants met their burden of rebutting the presumption. Each defendant submitted affidavits providing legitimate reasons for his decision. Plaintiffs now focus their attention on Glasser. They contend that because this was the first time he converted his SARs into cash rather than stock, the irregularity of the transaction supports a finding of intent to defraud. Yet the affidavits on file establish that Glasser's accountant advised him to take the SARs in cash in order to diversify his portfolio and because Glasser was about to purchase a second home. Perhaps more significantly, plaintiffs' theory is undermined by evidence showing that over the course of the class period, Glasser acquired approximately 10,000 more shares of GATX stock than he sold; a position unlikely to be taken by an insider who has unpublished knowledge of the company's slowdown. In light of this evidence, the district court was correct in concluding that as a matter of law, Glasser's conversion of his SARs did not support an finding of fraudulent intent.

■ Finally, we consider plaintiffs' claim that the district court improperly limited their discovery. Because the district court is far better situated to pass on discovery matters, we review its discovery decisions for an abuse of discretion. *Jurcev v. Central Community Hosp.,* 7 F.3d 618, 627 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1830, 128 L.Ed.2d 459 (1994). We will not reverse the court's decision absent a clear showing that the denial of discovery resulted in actual and substantial prejudice to the complaining litigant. *Id.; Visser v. Packer Eng'g Assocs., Inc.,* 909 F.2d 959, 962 (7th Cir.1990). The court ruled that plaintiffs could obtain discovery into GATX documents generated between December 1, 1990, and October 17, 1991 (the date Glasser announced the expected drop in earnings). As set, this period enabled plaintiffs to see all versions of the budget including the final one. Plaintiffs were also able to depose several of GATX's officers. Nevertheless, plaintiffs later sought to extend the discovery period back several months, but the court refused. Plaintiffs allege that this refusal was an abuse of discretion because it did not afford them sufficient discovery into the research upon which GATX's five-year budget was based.

■ The plaintiffs' claim remains as speculative now as it was before the trial court. They do not present us with an articulable suspicion of what it is they are looking for. There is no allegation that the budget itself was unreasonable. Further, we believe that plaintiffs had an adequate opportunity to investigate this line of inquiry. Included in the budget was a list of the assumptions on which it rested, and plaintiffs could have explored these assumptions in its depositions. In fact, the district court stated that if after deposing the officers involved in the preparation of the budget, plaintiffs learned of documents that might assist them, they could renew their motion at that time. They never

did. On appeal, they have not addressed to our satisfaction what it is they hope to find by enlarging the scope of discovery.

Moreover, we do not find the degree of prejudice necessary to reverse the decision below. As should be clear from our analysis, the budget played a minor role in the judgment. Not only were the cited instances of fraudulent misrepresentation too vague to support a securities fraud claim, but GATX's past performance provided Glasser with a reasonable basis for making those statements. In short, it was not as if the budget provided the defendants with their only defense against these allegations. Because the research upon which the budget was based was of little relevance to plaintiffs' claims, we cannot say that they were substantially prejudiced by its exclusion.

■ The federal securities laws should not be mistaken for insurance against risky investments; the federal reporters are replete with failed attempts to do just that. Securities laws protect investors against fraud; they do not provide investors with a recourse against unsuccessful management strategies. Because the plaintiffs have been unable to show that this is a case of fraud, the district court's decision is

AFFIRMED.

ROVNER, Circuit Judge, dissenting in part.

I join the majority's opinion in all but one respect. When Glasser and the other defendants represented in 1991 that they expected future disposition gains to remain "high," they knew from the company's internal budget that disposition gains were in fact projected to fall dramatically beginning in 1992. *Searls v. Glasser*, 1994 WL 523712, at *12 (N.D.Ill. Sept. 21, 1994). The district court thought that the representations were not misleading because even if the projected drop of $24 million in disposition gains between 1991 and 1992 were taken into account, "it would [still] be fair to characterize disposition gains as an important stream of income." *Id.* In a somewhat similar vein, my colleagues reason that the term "high" is so vague that a reasonable investor would place no reliance on it. *Ante* at 1067–68.

Although I agree that in the abstract, the word "high" "is of no help to the investor," (*ante* at 1067), placed in context I believe it reasonably connoted disposition gains akin to those the company had seen in prior years. GATX's annual disposition gains had exceeded the $20–million mark for nearly a decade. Indeed, the company's 1990 annual report (released in March, 1991) included a graph reflecting a steady increase in gains from just over $20 million in 1987 to just under $50 million in 1990. At these levels, disposition gains had come to represent a significant share of the company's net income—nearly 40 percent in 1990. Against this backdrop, assurances that future gains would remain "high" suggests a continuation of the trend GATX had seen in recent years. Different investors, I agree, might come up with different numbers if pressed to predict exactly how "high" disposition gains would be in 1992—the figure might be above, level with, or even slightly below recent figures and still be consistent with the company's prediction. But common sense suggests that few, if any, investors would anticipate from the company's confident predictions the tumble to $14 million that GATX itself expected. Thus, I believe it mistaken to declare, as a matter of law, that the company's projections amounted to no more than "loose predictions" (*ante* at 1067); that determination should have been left to a jury.

The majority also suggests that the record lacks sufficient evidence that the defendants either deliberately or recklessly misrepresented the level of future disposition gains, asserting that "plaintiffs' argument attaches too much significance to the five-year budget." *Ante* at 1067. On this point I disagree as well. Granted, in *Panter v. Marshall Field & Co.*, 646 F.2d 271, 292–93 (7th Cir.), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981), a divided panel of this court found the earnings estimates contained in the defendant's five-year plan too tentative to impose a duty to qualify the more rosy forecast which had been given to the public. But the internal projections at issue in *Panter* were described by the court as "hastily updated," "highly tentative," and at odds with the forecast of the defendant's own in-

vestment bankers. *Id.* at 292. It is far from clear that GATX's estimates of future disposition gains are of a like character. Indeed, when GATX finally disclosed the projected earnings decline in October of 1991, the first reason it cited for the drop was "fewer assets coming off lease which in turn will generate lower disposition gains." The number of assets available for sale at the conclusion of their leased terms would seem to me to be a readily quantifiable figure rather than a vagary of the market-place. At the very least, the reliability of the company's internal projections, and in turn the defendants' scienter as to the more optimistic forecasts presented to the public, present a question for the jury to resolve. *See Folger Adam Co. v. PMI Indus., Inc.,* 938 F.2d 1529, 1534–35 & n. 8 (2d Cir.), *cert. denied,* 502 U.S. 983, 112 S.Ct. 587, 116 L.Ed.2d 612 (1991).