**ITOBA LIMITED, Plaintiff,**

v.

**LEP GROUP PLC, William R. Berkley, John L. Read, Peter J. Grant, and John R. East, Defendant.**

**No. 5–92–CV–556 (WWE).**

United States District Court, D. Connecticut.

Jan. 4, 1999.

James C. Riley, Richard F. Lawler, Whitman, Breed, Abbott & Morgan, Greenwich, CT, James Robert Pigott, Jr., Mark C. Zauderer, Roanne L. Mann, Colin A. Underwood, Harry Frischer, Solomon, Zauderer, Ellenhron, Frischer & Sharp, New York City, Gary A. MacMillan & Lucas, Stamford, CT, for Itoba, Limited.

Mark B. Seiger, Edwards & Angell, Hartford, CT, for LEP Group PLC.

Jonathan B. Orleans, Zeldes, Needle & Cooper, Bridgeport, CT, William G. McGuinness, Cassandra F. Lentchner, Rachel Fleishman, Sherab Posel, Fried, Frank, Harris, Shriver & Jacobson, New York City, for William R. Berkley.

David Eric Ross, Pober & Ross, Westport, CT, Lucia Jean Wolgast, Westport, CT, Leslie K. Dellon, Kepon, McCarthy, Jutkowitz & Holzworth, Washington, DC, for John L. Read.

John L. Read, Esher, Surrey, Westport, CT, pro se.

### RULING ON MOTION OF DEFENDANT WILLIAM R. BERKLEY FOR SUMMARY JUDGMENT

EGINTON, Senior District Judge.

Plaintiff Itoba Limited ("Itoba") has filed a multi-party, multi-count complaint, two counts of which are against defendant William Berkley ("Berkley"), a former non-executive director of the LEP Group ("LEP"), a London-based holding company. Itoba's complaint alleged that Berkley violated Sections 10(b) and 12(2) of the Securities Exchange Act of 1934 and Rule 10b–5. Berkley has denied the allegations and has moved for summary judgment on these two counts.

In its opposition to Berkley's Motion for Summary Judgment, Itoba withdrew Count V, its Section 12(2) claim against Berkley. For the following reasons, the Court DENIES the Motion for Summary Judgment as to the remaining Count IV, alleging Berkley's violation of Section 10(b) and Rule 10b–5.

### STATEMENT OF FACTS

Itoba is a wholly-owned subsidiary of ADT Ltd., which is a holding company engaged primarily in providing security and protection systems.

Berkley received a seat on LEP's board after LEP's September 1988 acquisition of Berkley's company, National Guardian Corporation ("NGC"). His role on the board was to assist with overseeing business related to NGC.

In connection with LEP's acquisition of NGC, Berkley received shares of LEP stock in September 1988. The stock was subject to a two-year restriction or "lock-up." Berkley sold his LEP shares on October 8, 1990 after the expiration of the two-year restriction.

In 1989, Nicholas Wells, a financial analyst for ADT, conducted a review of LEP to consider acquisition of LEP shares. Wells' examination of LEP focused largely on LEP's Form 20–F filed with the United States Securities and Exchange Commission for 1988 and a business analysis of LEP by S.G. Warburg, a London investment bank. The Warburg report was based on LEP's United Kingdom annual report, LEP's shareholder register, and broker reports, as well as its 1988 Form 20–F. After Wells' analysis, ADT decided to acquire LEP shares through Itoba, one of its offshore subsidiaries.

On or about October 8, 1990, Itoba purchased the LEP shares that Berkley had sold. Itoba bought Berkley's shares over the London Stock Exchange using its own broker.

On September 23, 1991, LEP made its first public announcement that its financial results for the first half of 1991 were substantially lower than that of 1990, and that provisions would need to be made for LEP's United States real estate investments. In 1992, LEP reported that its 1991 operations had a net loss of £235.1, the largest component of which was attributable to LEP's real estate investments in California. The company was eventually forced to file bankruptcy and the shareholders lost their investments.

Itoba claims that Berkley, prior to selling his shares, had material non-public information concerning LEP's real estate investments in California. In his Motion for Summary Judgment, Berkley argues that Itoba's allegations are deficient because 1) Itoba cannot prove that he was in possession of material non-public information, and 2) Itoba cannot prove that Berkley acted with the requisite scienter necessary to sustain an insider trading claim.

### LEGAL ANALYSIS

A motion for summary judgment will be granted where there is no genuine issue as to

any material fact and it is clear that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden is on the moving party to demonstrate the absence of any material, factual issue genuinely in dispute. *American International Group, Inc. v. London American International Corp.*, 664 F.2d 348, 351 (2d Cir.1981). In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

Itoba's claim against Berkley is based on the rule that anyone in possession of material inside information must either disclose it to the investing public or abstain from trading in or recommending the securities concerned while such inside information remains undisclosed. *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir.1968)(en banc), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

### A. Material Non–Public Information

■ The chief factual issue is whether Berkley possessed material non-public information. Information is material if a reasonable shareholder would be substantially likely to consider it important. *TSC Industries, Inc. v. Northway, Inc.* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

■ The determination of materiality is a mixed question of fact and law, requiring a delicate assessment of the inferences a reasonable shareholder would draw from a given set of facts. These inferences are peculiarly ones for the trier of fact and summary judgment is only appropriate if reasonable minds cannot differ on the question of materiality.

Berkley argues that he did not possess any material non-public information concerning LEP's real estate ventures in California. He points out that LEP's public filings disclosed that LEP had real estate joint ventures in California, which were financed by standby letters of credit of at least $99,415,000. The public filings briefly informed that the real estate investments were joint ventures, that LEP's role was limited to providing standby letters of credit, that LEP sometimes made loans to projects or acted as a general partner, and that the standby letters of credit were for varying periods up to December 31, 1991. The filings did not provide further indication of the California investments' financing structures and risk apportionment.

LEP's real estate investments were set up as LCs, each of which borrowed 100% of the funds necessary for the project. LEP was responsible for the first 25% of the losses for each project rather than a prorata share with its joint venturers.

As Itoba points out, this arrangement meant that LEP's California properties represented highly leveraged investments. If property values declined by 25% and the loan could not be repaid, a lending bank could first call upon LEP to recoup its losses and then could sell the underlying partnership assets, causing LEP to lose its entire investment. Berkley does not object to Itoba's description of its financing arrangement but argues that Wells had the experience to assess the risk associated with standby letters of credit. Whether Wells should have comprehended LEP's level of risk absent a disclosure of the investments' financing structures with the 25% guarantee presents a question of fact in dispute. However, taking all reasonable inferences in favor of Itoba, the evidence indicates that Wells could not have understood the level of risk associated with LEP's California real estate ventures from LEP's public filings.

Berkley maintains that Itoba cannot prove that Berkley possessed material information. The Court recognizes that the opportunity to obtain such information alone is not enough to establish that such information existed and was obtained. *Azurite Corp. v. Amster Co.*, 844 F.Supp. 929, 937 (S.D.N.Y.1994). An insider trading claim cannot be sustained on merely the fact that a company made a bad news public announcement coupled with the

fact that the defendant was in a position to be privy to such information prior to his sale of company shares. *Froid v. Berner,* 649 F.Supp. 1418, 1423 (D.N.J.1986).

In the instant case, Itoba has supported its claim with specific evidence, including deposition testimony and documentation of information presented to board members. Itoba's evidence demonstrates that the LEP board members had been informed that LEP had financed its California real estate investments with a highly leveraged credit structure, and that from November 1989, the board members had concerns about LEP's increasing indebtedness due to these investments as well as LEP's ability to afford such a high level of contingent liability.

Berkley claims that Itoba's case hinges primarily on a note written by non-executive director Michael Broke summarizing his conversation with LEP's real estate consultant Harvey Soning. The note, a copy of which Berkley received, states that Soning called LEP's California real estate investment "a major disaster" that could "bring down the company." Berkley argues that this note is not probative that Berkley possessed material information because it is potentially incompetent as hearsay, Soning disassociated himself from such statements, and Broke did not believe the note's information to be material. Regardless of the merit of these assertions, Berkley's argument is not persuasive that summary judgment is appropriate on the issue of materiality. Itoba's claim does not rely solely upon this one note. Itoba has also submitted deposition testimony and other documentation that raise genuine issues of fact concerning Berkley's knowledge of the California investments' financing arrangement and its significance to LEP's capacity to sustain its increasing debt associated with these properties.

Further, Berkley argues that Itoba cannot show that a reasonable shareholder would consider information about LEP's failing real estate investments important. The foundation of this argument is the fact that Itoba continued to purchase LEP shares in November 1990 after being informed by the investment bank, Barclays de Zoete Wedd ("BZW") that LEP's United States real es-

tate joint ventures were financed by £59.5m in irrevocable letters of credit but had a realizable value of only £10m. BZW's report advised that the letters of credit presented a potentially large liability, but BZW was not aware of how LEP had financed its ventures and could not assess LEP's capacity to sustain such losses. Significantly, BZW's report stated that more information was needed on the nature of the joint ventures. Thus the BZW report seems to highlight that a reasonable shareholder would consider that information concerning the joint ventures' financing arrangement was important. Itoba's continued acquisition of LEP shares without this information makes summary judgment on the issue of materiality inappropriate.

### B. *Scienter*

Scienter is a mental state embracing an intent to deceive, manipulate or defraud. *Aaron v. SEC,* 446 U.S. 680, 686 n. 5, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). The existence of scienter may be proven by circumstantial evidence. *United States v. Mylett,* 97 F.3d 663, 668 (2d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2509, 138 L.Ed.2d 1013 (1997). The Second Circuit has held that recklessness satisfies the scienter requirement in the context of a private action. *Rolf v. Blyth, Eastman, Dillon & Co. Inc.,* 570 F.2d 38, 44 (2d Cir.1978), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978). Scienter may also be proved by knowing misconduct. *SEC v. Falbo,* 14 F.Supp.2d 508, 524 (S.D.N.Y.1998).

An insider's suspicious sale of holdings followed by publication of material adverse information can be rebutted by information that provides a legitimate reason for the sale. *Searls v. Glasser,* 64 F.3d 1061, 1068 (7th Cir.1995). Credible and wholly innocent explanations such as longstanding patterns of periodic divestment, if unrebutted, are sufficient to defeat an inference of scienter. *Provenz v. Miller,* 102 F.3d 1478, 1491 (9th Cir.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 48, 139 L.Ed.2d 14 (1997). Berkley asserts that he sold his LEP shares for the legitimate purpose of making a capital investment in Finevest Foods, Inc., which

should rebut any inference of scienter necessary to an insider trading claim.

Although summary judgment is not generally appropriate on the issue of scienter, the analysis of the Seventh Circuit in *Searls* is instructive of when summary judgment based on scienter is proper. *Searls* stated that the defendant's continuing acquisition after the sale of company stock was the most significant evidence to rebut the scienter inference, although the defendant had also submitted affidavits averring to advice from his accountant to diversify his portfolio and to his planned purchase of a second home.

In the instant case, Berkley submits evidence demonstrating that, prior to the actual October 1990 sale of his LEP shares, he discussed the sale of LEP shares for a $20 million capital investment in Finevest. He did not, however, immediately make this investment after the sale of his stock, which he states was due to banking complications. He eventually made the investment in Finevest during hardball negotiations after Finevest had filed for bankruptcy and he was required to pay down the company's debt. The fact that his actual investment occurred only upon the exigency of hardball negotiations makes his explanation of a legitimate purpose seem less than wholly innocent and casts a shadow on its credibility. Thus questions of fact surround his motivation to sell his LEP shares in October 1990. Unlike *Searls*, there is no other clear indication that he was not functioning in violation of Section 10b and Rule 10b–5.

Finally, Berkley claims that his sale of LEP shares eleven months prior to LEP's bad news announcement cannot support a finding of scienter. However, the time between the violation and the negative disclosure is not necessarily dispositive. *See Freedman v. Value Health, Inc.*, 958 F.Supp. 745, 750 (D.Conn.1997). Berkley cites authorities that declined to find an inference of scienter where the plaintiffs lacked any specific evidence and the only circumstantial evidence of timing was weak. *In re Stratosphere Corporation Securities Litig.*, 1 F.Supp.2d 1096, 1116–7 (D.Nev.1998) (no showing of motive or opportunity except the trading itself); *In re Buffets, Inc. Securities Litig.*, 906 F.Supp. 1293, 1300 (D.Minn.1995) (complaint did not allege why sales were suspicious and was dismissed without prejudice); *In re Browning–Ferris Industries Inc. Securities Litig.*, 876 F.Supp. 870, 910 (S.D.Tex.1995)(plaintiffs failed to allege any specific, undisclosed "insider" information).

In contrast, Itoba has demonstrated for purposes of summary judgment that Berkley possessed undisclosed potentially material information regarding the financial position of LEP's California investments prior to selling his shares of LEP. As an inference of scienter exists, summary judgment in this instance is not appropriate.

### CONCLUSION

For the foregoing reasons, defendant's Motion for Summary Judgment [Doc. No. 319] is DENIED as to Count IV of the Complaint. Plaintiff has withdrawn Count V of the Complaint.

SO ORDERED.