In re ADOBE SYSTEMS, INC.
SECURITIES LITIGATION.

This Document Relates
to: ALL ACTIONS.

Nos. C–90–2453–SBA to C–90–2456–SBA.

United States District Court,
N.D. California.

March 17, 1992.

913

William S. Lerach, San Diego, Cal., for plaintiffs.

Jeffrey S. Facter, Shearman & Sterling, San Francisco, Cal., for defendants.

### ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ARMSTRONG, District Judge.

This is a class action on behalf of those who bought stock in Adobe Systems, Inc. ("Adobe") between March 6 and May 24, 1990. The plaintiffs allege that during that period defendants artificially inflated the price of Adobe's stock by issuing false or misleading public statements in violation of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and 78t(a), Rule 10b–5 thereunder ("Rule 10b–5"), and California fraud and negligent misrepresentation laws.

In addition to Adobe, the defendants are certain of Adobe's officers and directors ("the Individual Defendants"): John E. Warnock ("Warnock"), Chairman of the Board and Chief Executive Officer and Director of Adobe; Charles M. Geschke ("Geschke"), President and Chief Operating Officer and a Director of Adobe; M. Bruce Nakao ("Nakao"), Vice President of Finance and Administration, Chief Financial Officer, Treasurer and Assistant Secretary of Adobe; and Stephen A. MacDonald ("MacDonald"), Senior Vice President, International Systems Division of Adobe.

The matter is currently before the court on defendants' motion for summary judgment.[1]

---

1. Oral argument on this motion was held on    November 26, 1991. Also before the court are:

Having carefully considered the arguments of the parties, defendants' motion for summary judgment is HEREBY GRANTED.

## BACKGROUND

Adobe was founded in 1982 and manufactures and develops software for the computer industry. Adobe's main product, the PostScript interpreter, is the page description language for electronic printing and publishing and computer displays. Adobe licenses the PostScript interpreter to original equipment manufacturers ("OEMs") who incorporate Adobe's technology into their products and pay Adobe a royalty based on the volume of printers or other incorporating devices sold to end users.

On March 6, 1990, Adobe's common stock opened at $33 per share. The stock closed at $36.375 on that day, and then fluctuated within the range of $36.50 and $45.00 between March 6 and April 19, 1990, before steadily climbing to a peak price of $50.50 on May 24, 1990.

On May 24, 1990, Adobe announced that earnings for the second quarter of its 1990 fiscal year, ending June 1, 1990, would be lower than previously expected. Adobe stated that three of its significant customers had reduced their product shipments.[2] After the market opened on May 25, 1990, the price of Adobe stock dropped over 15 points, or around 30% of its value, from $50.50 per share to $35.25 per share at the close on May 25.

Plaintiffs allege that during the period between March 6 and May 24 ("the Class Period"), defendants issued a series of public statements regarding Adobe's prospects in press releases, interviews, filings with the Securities and Exchange Commission, and a quarterly report, which were false or misleading in light of undisclosed "adverse information" known to defendants at the time the statements were made. The alleged purpose and result of the false and misleading statements was to enable the Individual Defendants to sell significant amounts of their Adobe stock at inflated prices, prior to the public disclosure of the adverse information about Adobe's earnings prospects. The "adverse information" whose nondisclosure plaintiffs allege rendered defendants' statements false or misleading is: (1) Adobe's internal analysis of its prospects for Fiscal 1990 and in particular the projected 1990 earnings of $1.47 to $1.68 per share identified in the 1990 Adobe Financial Plan ("the 1990 Financial Plan"); (2) short-term adverse information being received from certain of Adobe's significant OEMs; (3) the prospect of losing or receiving substantially reduced royalties from Adobe's largest customer, Apple Computer ("Apple"); and (4) the fact that 40% of Adobe's employees (at least 170 persons) were selling significant shares into the market without any public disclosure of such sales.

## DISCUSSION

Defendants argue for summary judgment by asserting that defendants' statements are not inherently actionable under Rule 10b–5 because the financial community could not have regarded them as projections. Defendants argue next that a reasonable jury could not, in any event, conclude that defendants' statements were either untrue or misleading. Defendants also argue that plaintiffs cannot establish the requisite scienter to succeed on their 10b–5 action. Defendants contend, finally, that plaintiff's pendent state claims should

(1) plaintiffs' motions to strike all or part of the declarations of Jon S. Anderson, Charles M. Geschke, Stephen A. MacDonald, Clinton E. Nagy, M. Bruce Nakao, David Pratt, R. Daniel Putnam, John E. Warnock, Jonathan Seybold, W. Christopher Mortenson, Frederick J. Ruvkun, Bruce Lupatkin, James Berdell, and Russell Crabb; and (2) defendants' motion to strike all or part of the declarations of Dale F. Pilz and John B. Torkelsen. Plaintiffs also submitted, but not in accordance with the Local Rules of this Court, a motion to strike eleven other pleadings submitted by defendants in connection with the motion for summary judgment.

**2.** On May 25, 1990, before the stock market opened, Adobe made a second announcement to correct, slightly upward, the estimates it had announced the day before. The previous day's figures had been based on faulty information from Apple Computer, one of its OEMs.

be dismissed in the event the federal claims are dismissed.

Because plaintiffs have not provided evidence from which a reasonable jury could conclude that defendants made statements that are actionably misleading under Rule 10b–5, the court hereby grants defendants' motion for summary judgment.

### A. The Inherent Actionability of Mr. Nakao's March 20 Statement

■ Rule 10b–5, enacted under Section 10(b), makes it unlawful in connection with the purchase or sale of securities "[t]o make any untrue statement of fact or to omit to state a material fact necessary to make the statements made, in light of all the circumstances in which they were made, not misleading." The most obvious example of a false or misleading statement is a misrepresentation of an historical fact, but projections and general expressions of optimism can also be actionalb eunder the federal securities laws. *See In re Apple Computer Securities Litigation,* 886 F.2d 1109, 1113 (9th Cir.1989), *cert. denied,* 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990); *Marx v. Computer Sciences Corp.,* 507 F.2d 485, 489–492 (9th Cir.1974); *G & M Inc. v. Newbern,* 488 F.2d 742, 745–46 (9th Cir.1973).

The statement the parties pay the most attention to in their papers is Mr. Nakao's statement during his March 20, 1990 conference call with securities analysts. At issue is the following exchange:

Mr. Berdell (Analyst): Bruce, I'm wondering with the first quarter coming in at the high end of the range on earnings, and the new product momentum you discussed, how comfortable you are with the $2.25 estimates out there.

Mr. Nakao: Well, Jim, I think you know that most of those estimates are clustering around $2.10 or so, and I guess obviously we'd feel more comfortable with that, and I'm not saying $2.25 is not doable, but I think we just need to wait and see a little longer, it's kind of early in the year yet.

Defendants contend that Mr. Nakao's remarks are unactionable because of their inherent cautionary and ambiguous character and because the analysts who heard the remarks did not, in any event, "rely" on those remarks as a "projection," thereby rendering the remarks irrelevant to the market price of Adobe stock.

■ There is considerable appeal to defendants' argument that Mr. Nakao's March 20 comments were so inherently cautionary and ambiguous as to be unactionable under Rule 10b–5 as a matter of law. It is, at least upon first impression, counter-intuitive indeed to treat as evidence of an individual's intentional artificial *inflation* of a stock's market price, a statement in which that individual responds to another party's question by suggesting that the questioner's estimate of the company's earnings was too high. In that regard, the court agrees that a statement's simultaneously cautionary character and facial ambiguity should weigh heavily against a finding that a given statement is misleading, even to the point, in appropriate circumstances, of rendering the statement unactionable as a matter of law. However, a statement's cautionary and ambiguous character cannot be deemed to render a statement unactionable *automatically.* As Judge Conti observed in denying defendants' motion to dismiss plaintiffs' complaint, a particular cautionary and ambiguous statement of guidance to analysts could nevertheless give an overly optimistic impression and therefore be misleading, *In re Adobe Systems, Inc. Securities Litigation,* 767 F.Supp. 1023, 1028 (N.D.Cal. 1991), which is exactly the concern of Rule 10b–5.

■ Here, the plaintiffs have provided expert opinion that Mr. Nakao's March 20 comment, though clearly cautionary and to some extent ambiguous, could well have been considered a projection in the context in which it was made: *i.e.,* a conference with securities analysts. John B. Torkelsen, who has been active in the securities industry as a professional securities analyst for over 22 years, and who has provided interviews, reports, research material, and consulting to and at the request of organizations including *The Wall Street*

*Journal, Business Week, Fortune Magazine, CBS News, The New York Times,* and *The Journal of Commerce,* declared:

> It is my opinion, as a securities analyst, that Mr. Nakao, on behalf of Adobe, communicated that management was "comfortable" with annual earnings per share estimates for 1990 of $2.10. Mr. Berdell had obviously asked for guidance. In response to such a question, management's comments are expected to provide insight into the Company's own expectations. Plainly, Mr. Nakao provided that guidance and expressed that Adobe was "comfortable" with estimates of $2.10.
>
> \* \* \* \* \* \*
>
> In my opinion, based upon my years of experience discussing management expectations about future earnings, analysts and the market understood Mr. Nakao's comments to communicate that Adobe accepted the $2.10 as a reasonable estimate of the Company's 1990 earnings. Mr. Nakao had to know that his comment would be understood in that fashion.

Defendants have moved to strike Mr. Torkelsen's testimony regarding Mr. Nakao's March 20 statement, but the court finds the motion to strike, at least to the extent that motion challenges Mr. Torkelsen's statements regarding the March 20 conference call, unpersuasive. The court holds that those paragraphs *are* opinions of an expert interpreting how such comments would be taken in the context of corporate executives' communications to financial analysts, an area in which Torkelsen does appear to be an expert. Therefore the court DENIES the motion to strike those paragraphs of the Torkelsen declaration concerning the March 20 statement.

The court, moreover, rejects defendants' argument that the declarations of analysts who heard the March 20 statement render that statement unactionable. Defendants' argument is that if the analysts who participated in the March 20, 1990 conference call did not regard Nakao's statement as a projection, then it cannot be said that the price of Adobe stock reflected (and was artificially inflated by) Nakao's statement, because the 10b–5 claim depends on a fraud *on the market.*[3] In support of this argument, defendants note that five analysts who participated in the March 20, 1990 conference call (including Mr. Berdell, who had asked the question to which Mr. Nakao was responding) have submitted declarations in which they state:

(1) that they did not consider Mr. Nakao's statement a projection that Adobe would earn $2.10 in FY 1990;

(2) that their earnings estimates and stock recommendations were not changed or influenced by virtue of Mr. Nakao's statement; and

(3) that to the extent that Mr. Nakao's statement was at all a factor in their valuation of Adobe stock or in their estimates of Adobe earnings, it guided them *downward* from Wall Street's highest projections.

Defendants' argument and the analysts' testimony miss the point. Plaintiffs' allegation is that Mr. Nakao *misled* the analysts by *reinforcing* their *current* estimates—*i.e.,* by giving them *no reason* to change their estimates or, as the analysts describe it, to have been "influenced" by what Nakao said. The important point is that *had* Nakao disclosed to them the adverse information plaintiffs allege he should have, then, arguably, the analysts *would* have changed their estimates. That is the point of Rule 10b–5's encompassing statements made where the speaker is aware of undisclosed facts tending seriously to undermine the accuracy of the statement. *Apple,* 886 F.2d at 1113. More significant would have been testimony by the analysts that their estimates would *not* have been influenced if Nakao had *disclosed* the "adverse information" in response to Mr. Berdell's question. The analysts' testimony that Nakao's statement, if

---

**3.** The fraud on the market theory posits that investors rely on the integrity of the price of a company's stock which, in an efficient securities market, reflects all available information regarding the company and its prospects. *Basic, Inc. v. Levinson,* 485 U.S. 224, 241–245, 108 S.Ct. 978, 988–990, 99 L.Ed.2d 194 (1988).

anything, guided them "downward" from Wall Street's projections is likewise unavailing since the plaintiffs' position is that a *non*-misleading statement would have guided the analysts considerably *further* downward than Nakao's *actual* statement did.[4]

The court, accordingly, holds that Nakao's March 20 statement was not so *inherently* cautionary or ambiguous as to render it unactionable under Rule 10b–5 as a matter of law. The question remains, however, whether a reasonable jury could nevertheless conclude that that statement, even if reasonably construed as a projection that Adobe would earn $2.10 in Fiscal 1990, was either untrue or misleading under Rule 10b–5.

### B. *Was a $2.10 Projection Actionably Misleading?*

■ A projection or statement of belief may violate Rule 10b–5 if any of the following implicit factual assertions of such a statement is not true: (1) that the statement is genuinely believed, (2) that there is a reasonable basis for that belief, and (3) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement. *Apple,* 886 F.2d at 1113; *Marx,* 507 F.2d at 490. The focus of the parties' debate is whether, with respect to a $2.10 Fiscal 1990 earnings projection, there is adequate evidence to support a jury finding that either consideration (2) or (3) above is not true.

As indicated, the "adverse information" that plaintiffs allege rendered an earnings projection of $2.10 for Fiscal 1990 misleading encompasses: (1) Adobe's internal analysis of its prospects for Fiscal 1990 and in particular the projected 1990 earnings of $1.47 to $1.68 per share identified in the

1990 Financial Plan; (2) short-term adverse information being received from certain of Adobe's significant OEMs; (3) the prospect of losing or receiving substantially reduced royalties from Adobe's largest customer, Apple; and (4) the fact that 40% of Adobe's employees were selling significant shares into the market without any public disclosure of such sales.

The court holds that: (1) the 1990 Financial Plan had already proven itself obsolete by the beginning of the Class Period such that it could not be evidence of the misleadingness of a $2.10 projection; (2) adverse information regarding Adobe's relationship with Apple was already public knowledge and therefore unavailable to plaintiffs as evidence supporting a fraud on the market claim and was otherwise irrelevant to Adobe's earnings for Fiscal 1990; and (3) a reasonable jury could not conclude that the evidence regarding royalty prospects from three of Adobe's OEMs (NEC, IBM, and Hewlett–Packard) rendered a $2.10 earnings projection misleading under Rule 10b–5.[5]

### 1. *The 1990 Financial Plan.*

■ The 1990 Financial Plan, including in particular its $1.47 to $1.68 Fiscal 1990 earnings estimate, was too obsolete, at the beginning of the Class Period, to serve as evidence that defendants' "projection" of $2.10 was misleading. It is undisputed that the Plan was already 50% off by the time the alleged projection was made: the Plan listed First Quarter earnings at $.32; Adobe's actual First Quarter earnings, announced March 20, 1990, were $.48.[6] The nondisclosure of internal corporate projections that have proven to be uncertain, much less significantly inaccurate, cannot serve as the basis for securities fraud liability. *See In re Convergent Technologies*

---

**4.** Because the analysts' testimony is thus unavailing, the court does not reach plaintiffs' motion to strike their testimony.

**5.** Although the court agrees with plaintiffs that conspicuous sales of Adobe stock by Adobe employees during the Class Period could possibly reinforce an inference of scienter, the court can see no basis for treating such sales of stock (which are identified above as the fourth item of undisclosed "adverse information") as rele-

vant to the *accuracy* of a $2.10 earnings projection, such accuracy being the focus of the Ninth Circuit inquiry as to the actionability of a projection or other forward-looking statement. *See Apple,* 886 F.2d at 1113.

**6.** It is also the case that Adobe's internal plan had mispredicted actual results by an average of 50% in the preceding three years.

*Securities Litigation*, 948 F.2d 507 (9th Cir.1991). *See also Weinberger v. Jackson*, [1990–91 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 95,693, 98,255 (N.D.Cal. Oct. 11, 1990) ("[A company's internal budget] process is necessarily flexible, constantly changing, and an attempt by many persons to predict the future. Opinions about the future necessarily vary as various elements come into focus, fade from importance, and are replaced by other considerations").

2. *The Uncertainties in Adobe's Relationship with Apple.*

■ Plaintiffs argue that a projection of $2.10 per share was also misleading because of perceived difficulties in Adobe's relationship with Apple. In particular, plaintiffs argue that Apple was seeking to negotiate a new royalty agreement with Adobe under which Apple would pay Adobe a lower percentage of royalties on the sales of its products. The evidence of the difficulties in that relationship does not support an inference that the $2.10 "projection" for Fiscal 1990 was misleading because Adobe's contract with Apple ran well past Fiscal 1990 so the old royalty rate was safe for Fiscal 1990. Moreover, as plaintiffs themselves make clear, concerns regarding the continued health of the Apple–Adobe relationship were widely publicized in the press. Those concerns therefore cannot be the basis of a fraud on the market case. *See Apple*, 886 F.2d at 1114–16 (intense press disclosure of adverse information served to render even statements of "unqualified exuberance" unactionable under Rule 10b–5).

3. *The "Bad News" from NEC, IBM, and Hewlett–Packard*

■ There being no basis to support a finding of fraud on the strength of either the nondisclosure of the 1990 Financial Plan or the existence of well-publicized uncertainties in Adobe's relationship with Apple, plaintiffs' fraud action is left relying on a host of muddled and hypothetical speculations about the amount of royalties Adobe would receive in Fiscal 1990 from three of its significant OEMs: NEC, IBM, and Hewlett–Packard. Even if the court were to disregard the declaration of Mary Bobel[7] and were to consider the arguments plaintiffs set forth in their Supplemental Memorandum in Opposition to Defendants' Motion for Summary Judgment,[8] the court concludes that plaintiffs' speculative theories regarding such royalties are inadequate to send this 10b–5 action to the jury.

■ The Supreme Court has made clear that strained or inconclusive inferences alone should not defeat a motion for summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252–57, 106 S.Ct. 2505, 2512–14, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–98, 106 S.Ct. 1348, 1355–62, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325–328, 106 S.Ct. 2548, 2553–55, 91 L.Ed.2d 265 (1986). The rigorous scrutiny of evidence offered in opposition to a motion for summary judgment is no less appropriate in complex, fact-specific securities fraud cases. *See, e.g., Convergent Technologies* (affirming summary judgment on truth and adequacy of disclosure grounds); *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1570–72 (9th Cir.1990) (affirming summary judgment on scienter grounds), *cert. denied*, —— U.S. ——, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991); *Apple*, 886 F.2d at 1114–1119 (affirming summary judgment on materiality, truth and scienter grounds); *Vaughn v. Teledyne, Inc.*, 628 F.2d 1214,

7. Defendants submitted the Declaration of Mary Bobel, Adobe's Corporate Controller since March 26, 1990, in connection with their reply brief. Her declaration supports the position that information about 1990 royalty prospects available to defendants during the Class Period did not tend to seriously undermine the accuracy of a $2.10 earnings estimate. Plaintiffs requested that her declaration be stricken as both untimely and improper. (Plaintiffs' motion to strike was itself irregular in that it was submitted to the court on November 19, 1991, designating a November 26, 1991 hearing date, without requesting an order shortening time.)

8. Said Memorandum was submitted on November 19, 1991. Plaintiffs request that it be considered if the court does not strike the Bobel Declaration. *See* note 7, *supra.*

1218–22 (9th Cir.1980) (affirming summary judgment on issues of scienter and adequacy of disclosure); *Weinberger* (granting summary judgment as to belief in and basis for revenue projections); *Numrich v. Gleason,* No. 88–140–MA, 1990 WL 209734 at *5–6 (D.Or.1990) (granting summary judgment as to belief in and basis for prediction). Common sense tells us—and case law supports the proposition—that courts must be especially wary of permitting a trial regarding (allegedly) fraudulent forward-looking statements to proceed on the strength of confusing and speculative inferences, because forward-looking statements—and earnings projections in particular—are uncertain by their very nature. *See Apple; Convergent Technologies; Weinberger; Wielgos v. Commonwealth Edison Co.,* 892 F.2d 509 (7th Cir.1989). If the mere existence of differing implications (for future corporate performance) reasonably drawable from information available at the time a projection is made can create a triable issue of fact in a lawsuit alleging that the projection was *fraudulent,* then virtually every lawsuit alleging such a projection would, it seems, go to trial—for, indeed, every projection of corporate earnings is uncertain and subject to different predictive interpretations. That is why 10b–5 liability for a projection requires that there be either *no* reasonable basis for believing that the projection was accurate or the awareness of undisclosed facts tending *seriously* to undermine the accuracy of that projection. *Apple,* 886 F.2d at 1113. Plaintiffs' profusion of varied interpretations and explanations of (what they themselves admit constituted) the vast and varied amount of information that would bear upon a projection of earnings for a corporation the size of Adobe stands much more strongly for the (rather obvious) proposition that there are any number of ways of interpreting the future implications of current information than it does for the proposition that an earnings projection of $2.10 for Fiscal 1990 was fraudulently misleading.

The court notes that plaintiffs have submitted the declaration of Dale F. Pilz who purports to offer expert opinion as to the misleadingness of a Fiscal 1990 projection of $2.10 per share. Defendants have moved to strike his declaration. As a general rule, summary judgment is inappropriate where an expert's testimony supports the nonmoving party's case. *Apple,* 886 F.2d at 1116. "However, where the evidence is as clear as that in this record, the court is not required to defer to the contrary opinion of plaintiffs' 'expert.' " *Id.* While the court does not consider Mr. Pilz's experience and qualifications so deficient as to be of no value to the court in interpreting complex financial information, the court does believe that plaintiffs offer much of Mr. Pilz's declaration to support conclusions that are simply inconsistent with governing legal authority regarding the actionability of forward-looking statements under Rule 10b–5. Such authority provides that forward-looking statements are not actionable so long as there was *some* reasonable basis for the forward-looking statement and no undisclosed facts tending *seriously* to undermine the statement's accuracy. *Apple,* 886 F.2d at 1113. Mr. Pilz's declaration simply shows that under *his* interpretation of a vast array of information (which interpretation (1) is based on a mode of analysis different from that undertaken by defendants and (2) relies on The 1990 Financial Plan which had already proven itself inaccurate by the beginning of the Class Period), an earnings estimate of $2.10 was unreasonable.

However, the parties have presented to the court at least five different ways that Adobe's 1990 earnings could have been estimated as of March 1990. There is the approach taken by Adobe management in March 1990 of using Adobe's most recent actual results ($.48/share for the first quarter ("Q1") of Fiscal 1990) as a predictive base, adjusting that base upwards for each of the next three quarters in light of Adobe's well-established performance history of posting higher earnings each successive quarter within the year, and recognizing that the $.48 is likely to be an artificially low predictive base because of the earnings opportunities presented by the new PostScript cartridge for Hewlett–

Packard ("HP"), IBM's March 5, 1990 endorsement of Adobe technology, and other new Adobe products. The result under that approach is approximately $2.10. There is the approach of Mr. Pilz, who prefers to use the 1990 Financial Plan as a predictive base, and to adjust for Q1 results ($.48 vs. $.32 called for by the Plan) by adjusting only the Plan's Q1 revenues (but not its costs) to arrive at $1.74. There is the approach of Mr. Torkelsen, who also uses the Plan as a predictive base, but who adjusts the Plan's Q1 revenue up, and, unlike Mr. Pilz, adjusts Q1 costs down, to arrive at $1.83 for the year. There is the hypothetical method offered by Adobe, for those who prefer using the Plan as a predictive base notwithstanding its obsolescence, which demonstrates the deficiency of the failure of Messrs. Pilz and Torkelsen to adjust the last three quarters of the Plan in light of what Adobe learned about its business from actual Q1 results. By adjusting the last three quarters by the same percentages as Mr. Torkelsen adjusted the Q1 costs and revenues, defendants arrive at a projection of $2.13. Finally, there is the short form approach, based on Adobe's repeated experience of having beaten its plan by approximately 50% each year, of adjusting the earnings number in the Plan ($1.47) upward by 50% to arrive at approximately $2.20.

Plaintiffs contend that their methods are the more reasonable ones because they are more detailed and they build on the work that went into the 1990 Plan. Defendants contend that their method is more reasonable because it uses more current data (Q1 results) as a predictive base, it takes historical earnings patterns into account to a greater extent, and it makes use of important industry developments that were not reflected in the 1990 Plan. Plaintiffs contend, essentially, that this dispute over methodologies is one that a jury should decide. That, however, is precisely what *Apple* prohibits. *Apple* prevents a jury from weighing alternative means of estimating earnings for purposes of deciding which such means is the most reasonable and from second-guessing the way in which a company arrived at its projection. Preventing a jury from engaging in that type of inquiry is consistent with the far higher standard appropriately applied to actions asserting the fraudulence of predictive statements which are, by their very nature, uncertain. It would be improper, therefore, for this court to permit a jury to engage in that type of inquiry here.[9]

■ Having failed, accordingly, to produce adequate evidence to send to the jury the question of whether a $2.10 earnings projection was misleading under Rule 10b–5, the court need not address the separate issue of scienter.[10] Nor does the court reach the "actionability" of the other statements addressed in the papers because implicit in plaintiffs' analysis is that defendants' "projection" of $2.10 per share earnings for Fiscal 1990 was defendants' *most* misleading statement. Having found a $2.10 projection not misleading as a matter of law, the other "less" misleading state-

9. Rather than grant the defendants' motions to strike the declarations of Mr. Pilz and Mr. Torkelsen, the court concludes, as did the Ninth Circuit in *Apple,* that summary judgment as to the actionability of the defendants' forwardlooking statements is appropriate, *notwithstanding* these "expert" declarations.

10. The court does, however, disagree with much of defendants' characterization of the Ninth Circuit's analysis of the scienter issue in *Apple.* The court does not construe *Apple* as holding that an inference of scienter is extinguished simply because a 10b–5 defendant's insider trading was made at less than the peak price during the Class Period. Nor does the court construe *Apple's* discussion of "innocent explanations" for insider trading as rendering an inference of scienter extinguished simply because defendants can show that the uses to which the sales proceeds were put are somehow inherently "innocent" in character. Such a standard would mean that the intentional, deceptive inflation of stock prices would be stripped of its actionability simply because an insider may have used the profits reaped from his insider trading in order, say, to help his son buy a house rather than, perhaps, to bribe a public official. The better reading of *Apple* is that the inference of scienter created by insider trading can be completely dispelled on a motion for summary judgment if the *totality of circumstances* provides such wholly innocent and unrebutted explanations for such stock sales that a reasonable jury could not possibly conclude that the sales were part of an intentional scheme to defraud the market.

921

ments (*e.g.*, Nakao's alleged endorsement of a $2.00 per share estimate) are, by necessity, unactionable as well.[11]

## C. *The Pendent State Claims*

Plaintiffs having provided the court with no explanation of, or authority for, why this court should retain jurisdiction over plaintiffs' state law claims where the court has concluded that the $2.10 "projection" was not misleading as a matter of law, plaintiffs' state law claims are hereby dismissed.

### CONCLUSION

IT IS HEREBY ORDERED THAT:

1. Plaintiffs' motion to strike portions of the declarations of Jon S. Anderson, Charles M. Geschke, Stephen A. Mac-Donald, Clinton E. Nagy, M. Bruce Nakao, David Pratt, R. Daniel Putnam, and John E. Warnock is DENIED.

2. Plaintiffs' motion to strike the declaration of John Seybold is DENIED.

3. As the court's decision on the motion for summary judgment does not rely on the declarations of securities analysts W. Christopher Mortenson, Frederick J. Ruvkun, Bruce Lupatkin, James Berdell, and Russell Crabb, the court does not reach plaintiffs' motion to strike said declarations.

4. Defendants' motion to strike the declaration of Dale F. Pilz is DENIED.

5. Defendants' motion to strike portions of the declaration of John Torkelsen is DENIED.

6. As the court's decision on the motion for summary judgment does not rely on the pleadings which are the object of plaintiffs' November 19, 1991 motion to strike certain pleadings of defendants (which motion was not, in any event, submitted in conformance with the Local Rules), the court does not reach said motion.

7. Defendants' motion for summary judgment is GRANTED.

IT IS SO ORDERED.

---

11. The court agrees with defendants that there are, in any event, serious questions as to whether certain of those other statements—especially Dr. Warnock's statements on March 6 and May 1—are not so patently vague as to be unactionable on their face.