## In re JOHN ALDEN FINANCIAL CORPORATION SECURITIES LITIGATION

### No. 95–CV–830.

United States District Court, S.D. Florida.

Jan. 7, 2003.

Guy Burdette Bailey, Jr., Jesse Creed Jones, Bailey & Dawes Coconut Grove, FL, Wendy Hope Zoberman, C. Oliver Burt, III, Berman DeValerio Pease Tabacco, Burt & Pucillo, West Palm Beach, FL, Robin F. Zwerling, Zwerling Schachter & Zwerling, New York, NY, for Plaintiff.

Mark Paul Schnapp, Greenberg Traurig, Miami, FL, Joseph A. DeMaria, Cornelius Thomas Tew, Jr., Tew Cardenas Rebak Kellogg Lehman et al., Miami, FL, Robert A. Horowitz, Karen Y. Bitar, Greenberg Traurig Hoffman, New York, NY, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

HIGHSMITH, District Judge.

THIS CAUSE is before the Court upon Defendants' Motion for Summary Judgment (DE 211 & DE 353). After careful consideration of the motion and the entire record, the Court will grant the motion in its entirety.

### I. Introduction

This is a securities fraud class action in which Plaintiffs allege, among other things, that Defendants John Alden Financial Corporation ("John Alden"), Glendon Johnson (its then President and CEO), Roger Rosenberger (its former President), Scott Stanton (its then CFO) and Bruce Caldwell (a former Executive VP) (collectively "Defendants"), artificially inflated the price of John Alden stock during the period October 27, 1994 through May 3, 1995 (the "Class Period") in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5. Plaintiffs allege that John Alden, a medical insurance company that specializes in providing insurance to small businesses, set a fraudulent 1994 year-end medical claims reserve ("1994 Reserve") in order to artificially inflate its 1994 earnings. Defendants respond that John Alden's reserve had a reasonable basis when set and that it turned out to be understated because of an unanticipated spike in medical claims.

The Court finds that Defendants are entitled to summary judgment because they have demonstrated that John Alden had a reasonable basis for its 1994 Reserve and its decision to increase the 1994 Reserve by $15 million on March 30, 1995. The Court bases its conclusion on the following undisputed facts: John Alden offered a reasonable rationale for the assumptions it used in setting its 1994 Reserve; John Alden's outside auditor, Price Waterhouse, was extensively involved in the reserving process; and Defendants offered a legitimate explanation why the 1994 Reserve, though reasonable when set, turned out to be understated. Finally, the undisputed facts relevant to the motives Plaintiffs suggest do not support an inference of fraud.

### II. Legal Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Material facts are identified by the substantive law applicable to the particular case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Mulhall v. Advance Security, Inc.,* 19 F.3d 586, 590 (11th Cir.1994). Only facts that "might

affect the outcome of the suit under the governing law" are material. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

The party moving for summary judgment always bears the initial burden of demonstrating the absence of any question of material fact. *Celotex,* 477 U.S. at 323–24, 106 S.Ct. 2548. Once the moving party has made such a showing, the adverse party "may not rest upon the mere allegations or denials of the adverse party's pleadings," but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Although all evidence and factual inferences are viewed in a light most favorable to the nonmoving party, *see Samples v. City of Atlanta,* 846 F.2d 1328, 1330 (11th Cir.1988), "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505.

### III. Factual Background

On February 9, 1995, John Alden announced its 1994 fourth quarter and full year earnings. On March 30, 1995, it announced that it was revising those earnings downward because it was increasing its 1994 Reserve by $15 million as a result of a sharp increase in claims received in February 1995 relating to medical services provided in 1994. It recorded the increase as a charge to its 1994 earnings because it had not yet filed its 1994 Form 10K with the Securities and Exchange Commission. John Alden also announced on March 30 that, also because of the increase in claims, it expected its 1995 first quarter earnings to be approximately $.25 per share less than analyst estimates. On March 31, John Alden's stock price fell to $18.50 per share, down $11.375 per share from the prior closing price. Shortly thereafter, Christopher Aronson, who had purchased

John Alden stock on November 2, 1994, filed a securities fraud class action on behalf of himself and a class of purchasers of John Alden stock from October 27, 1994 through March 30, 1995.

On May 3, 1995, John Alden announced its 1995 first quarter earnings. In its press release, it announced that, in light of claims received in April relating to medical services provided in 1994, it had increased its 1994 Reserve by an additional $10 million, resulting in a charge to its 1995 first quarter earnings. The next day, John Alden's stock price closed at $15.25 per share, down from $18.125 per share before the announcement. Shortly thereafter, the remaining named Plaintiffs filed securities fraud class actions on behalf of themselves and a class of purchasers of John Alden stock.[1]

### IV. Analysis

To prevail in a 10b–5 action, Plaintiffs must establish: (1) a false statement or omission of material fact, (2) made with scienter, (3) upon which the plaintiff justifiably relied, and (4) that caused the plaintiff to suffer injury. *Robbins v. Koger Properties, Inc.,* 116 F.3d 1441, 1447 (11th Cir.1997). In the Eleventh Circuit, scienter under Section 10(b) is defined as intentional – i.e., knowing – misconduct or "severe recklessness." *McDonald v. Alan Bush Brokerage Co.,* 863 F.2d 809, 814 (11th Cir.1989); *Kennedy v. Tallant,* 710 F.2d 711, 720 (11th Cir.1983). "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *McDonald,* 863 F.2d at 814. This degree of recklessness "com[es] clos-

---

1. In October 1995, Plaintiffs filed a Consolidated Amended Complaint. On September 30, 1996, the Court granted Plaintiffs' Motion for Class Certification and certified the class Plaintiffs proposed, namely, purchasers of John Alden stock between October 27, 1994 and May 3, 1995.

er to being a lesser form of intent than merely a greater degree of ordinary negligence." *Malin v. Ivax Corp.,* 17 F.Supp.2d 1345, 1361 (S.D.Fla.1998) (quoting *Sanders v. John Nuveen & Co.,* 554 F.2d 790, 793 (7th Cir.1977)); *see McDonald,* 863 F.2d at 814 n. 10.

■ Where, as here, Plaintiffs allege a host of misrepresentations and omissions that they claim artificially inflated John Alden's stock price during the class period, a "loss causation" analysis is particularly useful at the outset to identify which, if any of them, may be actionable. Loss causation is an essential element of a 10b–5 claim, and requires not only that the alleged misrepresentation or omission caused the Plaintiffs to pay more than they should have for the stock but that the disclosure of the true facts, which are alleged to have been materially misrepresented or omitted, must have caused the decline in the stock price. *Koger,* 116 F.3d at 1447.

Here, it is undisputed that Plaintiffs' loss stemmed from the stock price decline following the March 30 and May 3, 1995 announcements, both of which corrected deficiencies in the 1994 Reserve. Therefore, Plaintiffs' only viable claims are those based on misrepresentations or omissions that relate to the reserve increases described in those announcements.[2]

### John Alden's 1994 Reserve

#### A. Reasonable Reserves Not Actionable

■ Medical claims reserves are current projections of expenses the insurer will ultimately incur for medical services provided to its insureds. *See Delta Holdings, Inc. v. National Distillers and Chemical Corp.,* 945 F.2d 1226, 1229 (2d Cir.1991); *A.P.N. Holdings Corp. v. Hart,* 615 F.Supp. 1465, 1474–75 (S.D.N.Y.1985).

"A company's determination of ... reserves, like other types of forecasts, is considered fraudulent only if Plaintiffs can show that the company lacked a reasonable basis for the determination." *In re Cirrus Logic Securities Litig.,* 946 F.Supp. 1446, 1460 (N.D.Cal.1996). "[A]n inability to foresee the future does not constitute fraud, because the securities laws approach matters from an ex ante perspective. Therefore, as long as those statements [i.e., projections] had a reasonable basis when made, they do not constitute fraud." *Searls v. Glasser,* 64 F.3d 1061, 1066 (7th Cir.1995) (citations omitted; internal quotation marks omitted); *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1113 (9th Cir.1989); *Steiner v. Tektronix,* 817 F.Supp. 867, 877 (D.Or.1992). The fact that in hindsight the projection turned out to be wrong does not mean that it lacked a reasonable basis when made. *See In re Symbol Technologies Class Action Litig.,* 950 F.Supp. 1237, 1246 (E.D.N.Y. 1997).

■ If the undisputed facts demonstrate that the defendant had a reasonable basis for a projection, even if another projection may have had a more reasonable basis, summary judgment is appropriate. *In re Adobe Systems, Inc. Sec. Litig.,* 787 F.Supp. 912, 920 (N.D.Cal.1992), *aff'd,* 5 F.3d 535 (9th Cir.1993) ("[It is not the province of the jury] to weigh alternative means of estimating earnings for purposes of deciding which such means is the most reasonable and from second-guessing the way in which a company arrived at its projection. Preventing a jury from engaging in that type of inquiry is consistent with the far higher standard appropriately applied to actions asserting the fraudulence of predictive statements which are, by their very nature, uncertain. It would

---

**2.** Accordingly, the Court finds Plaintiffs' various theories of liability, including the so-called "mismatch," without merit.

be improper, therefore, for this court to permit a jury to engage in that type of inquiry here.").

In a case with facts strikingly similar to those here, *Mathews v. Centex Telemanagement, Inc.*, No. C–92–1837–CAL, 1994 WL 269734 (N.D.Cal. June 8, 1994), the court granted summary judgment dismissing plaintiffs' claim that Centex understated its bad debt reserve in order to artificially inflate its earnings. Even though Centex was experiencing an increase in its uncollectible receivables in the second half of 1991, due in large part to the "recessionary forces in the national economy," Centex, claiming to be a "growth company" that could withstand a recession, did not increase its reserve until May 1992, at which time it doubled its reserve. The plaintiffs alleged that Centex should have increased its bad debts reserve in the second half of 1991 and that the large reserve shortfall resulted from Centex' intentional understatement of its reserve, not from adverse developments after it set its reserve.

Like Centex, which had publicly disclosed the increases in its uncollectible receivables during the second half of 1991, John Alden publicly disclosed the increase in medical claims it was experiencing in the second half of 1994. Like Centex, John Alden consulted with its outside auditor, Price Waterhouse, with respect to the sufficiency of its 1994 Reserve but, unlike Centex, which was initially advised by its auditor to increase its reserve, Price Waterhouse never suggested to John Alden that it should increase its 1994 Reserve. Both Centex and John Alden offered explanations why their reserves had a reasonable basis and attributed their re-

spective reserve shortfalls to a sudden deterioration in their experience in the quarter after they set their reserves.

In granting the defendants' motion for summary judgment, the *Centex* court stated that "[w]hile Plaintiffs may be correct as a matter of hindsight – that is, that the receivable reserve might have been increased earlier – those differences of opinion do not rise to the level of misstatements or material omissions." *Id.* at *4. The Court observed that the "issues raised by Plaintiffs are claims about what the Defendants should have done. They do not establish anything more than differences in judgment and criticism by hindsight ... concerning a subject [the adequacy of reserves] on which reasonable business, accounting and legal minds differ constantly." *Id.* at *2. Relying on *Adobe Systems*, the Court held that since "the Defendants' method of projection was reasonable, summary judgment is appropriate. The jury need not be given the task of deciding whose proffered method is more reasonable." *Id.* at *6. In the present case, the Court finds no issue of material fact with respect to whether John Alden had a reasonable basis for setting its reserve. Accordingly, summary judgment is appropriate.

### B. Competing Reserve Calculations

Although John Alden implemented a new methodology to calculate its medical claims reserve in the fourth quarter of 1994, no evidence exists to support Plaintiffs' claim that John Alden implemented the new methodology to create a reserve that was artificially low or that the change to the new methodology had any material impact on the 1994 Reserve.[3]

---

**3.** As explained in John Alden's 1994 Annual Report, (SUF ¶ 54), when the new methodology was implemented as of October 1994, it decreased John Alden's reserve by approximately $8 million. There is no evidence, however, to support Plaintiffs' claim that this was a "manipulation of the reserve" to increase earnings. (References to "SUF" are to Defendants' Statement of Undisputed Facts

In an effort to demonstrate that Defendants did not have a reasonable basis for the 1994 Reserve, Plaintiffs offer the report of their actuarial expert who suggests an alternative reserve based on information that was available to John Alden when the 1994 Reserve was set. He concluded that the 1994 Reserve should have been set between $29.6 and $37.9 million higher than it was.[4] His main point is that John Alden ignored current market conditions when it set the 1994 Reserve and it should have assumed that its 1994 fourth quarter loss ratio would increase substantially over its third quarter loss ratio, like it did in 1993 and other years.

Defendants, however, have explained that John Alden's loss ratio in the fourth quarter increased over the third quarter in only three of the prior seven years, (Srite Ex. A.), and that 1993 itself was abernational. (SUF ¶ 46.) They further explained that the relatively slight increase in the 1994 fourth quarter loss ratio reflected adverse market conditions, compared to what John Alden had predicted earlier in 1994, (SUF ¶ 45); was consistent with the assumptions John Alden was currently using for pricing purposes, (SUF ¶ 47); and was based on a calculation expressly endorsed by Price Waterhouse's actuary. (SUF ¶ 42). Defendants' actuarial expert opined that John Alden's assumptions were reasonable. (SUF ¶ 71.)

By February 9, 1995, when John Alden announced its 1994 earnings, it had completed its regular hindsight review of the adequacy of the 1994 Reserve based on claims received in January (the "January Hindsight"). The January Hindsight showed the 1994 Reserve to be an estimated $7 million too high. (SUF 56; Yakre ¶ 3; Li ¶ 21; Spence ¶ 6; Stanton ¶ 6). These facts demonstrate that John Alden had a reasonable basis for its 1994 Reserve and a good faith basis to believe that it was adequate. A jury should not be permitted to second-guess its actuarial and business judgment. *Centex,* 1994 WL 269734; *Adobe,* 787 F.Supp. 912.

## C. Involvement of Price Waterhouse

John Alden's new methodology and the assumptions used to calculate the 1994 Reserve were also reviewed in detail by Price Waterhouse, which was given access to all relevant information, (SUF ¶ 69), suggesting a lack of scienter as a matter of law. *Centex,* 1994 WL 269734, at *7. Price Waterhouse's involvement is not disputed.

As part of its regular year-end audit, Michelle Mateja, a Price Waterhouse actuary, who worked with the John Alden audit team, reviewed John Alden's claims reserves and prepared a detailed report assessing the "reasonableness and appropriateness of the methodologies, underlying assumptions, and resulting amounts." She concluded that the method and assumptions used to calculate the 1994 Reserve, and the amount of the 1994 Reserve, "appear[ed] reasonable." (SUF ¶¶ 59,67,-68.)

On February 28, 1995, John Alden filed its 1994 Annual Statement with the State of Minnesota Department of Insurance.[5] The Annual Statement is required to contain an opinion from an Attesting Actuary certifying that the reserves are calculated

---

accompanying its Motion for Summary Judgment.)

4. When all 1994 claims were received and paid, the 1994 Reserve turned out to be $20.8 million too low. (Yakre ¶ 2, Ex. A.) Thus, Plaintiffs' after-the-fact calculation was between $8.8 and $17.1 million too high, almost

as much as John Alden's calculation was too low. Such a discrepancy demonstrates the subjective nature of estimating medical claims reserves.

5. Every insurance company is obligated to file Annual Statements with the insurance department of the state in which it is domiciled.

in accordance with standard actuarial practices and are reasonable. In January 1995, John Alden retained David Rogers of Price Waterhouse to be the Attesting Actuary. In his Statement of Actuarial Opinion, Rogers explained that he: (1) "examined the actuarial assumptions and actuarial methods used in determining reserves;" (2) "evaluated [the] data for reasonableness and consistency;" (3) "reconciled" the data; and (4) conducted such other review of the actuarial assumptions and actuarial calculations as he considered necessary. (SUF ¶ 64.) As Attesting Actuary, Rogers certified to the state insurance regulators that John Alden's 1994 year-end reserves were: "computed in accordance with presently acceptable actuarial standards consistently applied," "fairly stated, in accordance with sound actuarial principles," and "based on actuarial assumptions which produce reserves at least as great as those called for in any contract provision as to reserve basis and method." (SUF ¶ 64.)

With respect to the methodology itself, Price Waterhouse reported to the Audit Committee of John Alden's Board of Directors in early March 1995 that: "Based on the audit procedures performed which included analysis of the new methodologies by our actuaries, we concurred with management's conclusion that the reserve estimation changes represent an improvement in the Company's reserve calculation." (SUF ¶ 31.)

## D. Innocent Explanation for the 1994 Reserve Shortfall

John Alden also adequately explained why the 1994 Reserve turned out to be understated, namely an unanticipated spike in claims received after the 1994 Reserve was set, a phenomenon apparently experienced at the same time by John Alden's closest competitors. In its March 30, 1995 press release, John Alden announced that its 1994 Reserve proved to be too low based on an approximate 15% increase in claims received in February, followed by only a small decrease in March. This explanation is supported by John Alden's Claims Summary Report for the fiscal month ending March 21, 1995. (Spence Ex. A.) The report was summarized in a chart that John Alden presented to Price Waterhouse on or about March 27, 1995. (Spence Ex. B). The chart reveals that claims mail received increased by 17% in February 1995 compared with 5.6% and 1.4% decreases in December 1994 and January 1995, respectively. From that inflated level, the claims mail received decreased only 2.5% in March. (Spence ¶¶ 29–31.) [6]

Defendants' explanation for the reserve shortfall is further buttressed by the fact that John Alden's closest competitors reported similar experiences. It is undisputed that John Alden was the first medical insurance carrier to announce a sharp increase in claims in early 1995. Its announcement was followed by United Wisconsin revealing that its medical loss ratio

---

**6.** Plaintiffs offered declarations from three former employees to support their contention that there was no spike in claims. The declarants' observations, however, are insufficient to create a genuine issue of material fact in the face of this documentary evidence. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (stating that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to defeat summary judgment], there must be evidence on which the jury could reasonably find for the plaintiff.") "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (Citations omitted.) "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

was approximately 6 percentage points more than expected because of "higher paid claims in the first quarter, particularly during the month of March." (Defendants' Opening Memorandum Ex. B, p.11.) United Wisconsin explained that its analysis of medical costs based on paid claims information through March 31, 1995 reflected an acceleration of medical inflation, in terms of both utilization and increased prices, beginning in late 1994. *Id.* The four stock analysts Plaintiffs deposed, each of whom followed the medical insurance industry, testified that John Alden was the first to identify and announce what turned out to be the beginning of an increasingly adverse claims trend experienced industry-wide. (SUF ¶¶ 117–125.)

As the *Centex* court noted in connection with its finding that Centex' understated reserve did not constitute a misrepresentation, the dramatic change in experience after the reserve was set "lends credence to Defendants' contention that the 1992 increase in reserves was due to newly changed circumstances, not to prior fraudulent understatements." *Centex,* 1994 WL 269734 at *6. Such is the case here.

### E. Lack of Motive to Understate the 1994 Reserve

██ Plaintiffs contend that Defendants had several motives to artificially inflate John Alden's 1994 year-end earnings and, based on those motives, ask the Court to draw an inference that the 1994 Reserve was fraudulently set. Plaintiffs identify

the following motives: (1) to conceal material misrepresentations and omissions in connection with John Alden's August 1994 secondary public offering; [7] (2) to achieve analyst earnings estimates; (3) to earn 1994 bonuses; [8] and (4) to maximize Defendant Bruce Caldwell's profits from the sale of his stock. However, the undisputed facts are inconsistent with the motives Plaintiffs suggest and, therefore, do not support any inference of fraud.

If, in fact, Defendants had been motivated to commit fraud to achieve these objectives, common sense suggests they would have attempted to conceal the fraud for as long as possible. However, the undisputed evidence shows that the very same individuals who are alleged to have committed the fraud chose a method they knew would come to light promptly unless they were to perpetuate the fraud by repeating it. (SUF ¶ 72.) Instead of repeating the alleged fraud, however, the Defendants *themselves* initiated and conducted the February Hindsight analysis of the 1994 Reserve that first led to questions as to its adequacy. (SUF ¶ 79.) They then took it upon themselves to expedite the March Hindsight analysis of the 1994 reserve to confirm and quantify the shortfall, and promptly advised senior management and Price Waterhouse of their belief that the 1994 Reserve needed to be increased. (SUF ¶¶ 80–83.) Those same individuals then raised with Price Waterhouse the issue of whether, since John Alden had not yet filed its 1994 Form 10–K with the SEC

---

7. Plaintiffs have not asserted any claims with respect to the August offering. They contend, however, that at the time of the offering, Defendants knew, based on John Alden's own internal documents, that John Alden could not achieve analysts' 1994 earnings estimates. The Court has reviewed those documents and the corresponding testimony and finds that they do not support Plaintiffs' contention and, therefore, do not raise a genuine issue of fact. *See* infra at 1284–85.

8. Plaintiffs argue that the payment of the bonus slightly earlier than in prior years is evidence that Defendants knew the earnings announced on February 9, 1995 were fraudulent. The Court disagrees. The undisputed evidence shows that bonuses were always paid before March 15 and nothing happened between the date the 1994 bonuses were paid and March 15 that made the timing significant. (Stanton ¶ 5.)

(it was to be filed later that week), John Alden would have to revise its 1994 earnings instead of recording the increase as a charge against its 1995 first quarter earnings. (Spence ¶ 25.) Price Waterhouse and John Alden agreed that the company would have to take the charge against its 1994 earnings. As a result, John Alden did not realize its goal of achieving stock analysts' 1994 earnings targets, Defendants jeopardized their 1994 bonuses, and undermined their purported objective of concealing any improprieties related to the August 1994 offering. Since Defendants' actions were wholly inconsistent with the motives Plaintiffs suggest, the Court finds that the suggested motives do not create an inference of scienter.

■■■ The Court also finds that the trading in this case does not support an inference of scienter. Whether insider trading will support an inference that defendants engaged in securities fraud turns primarily upon (1) the percentage of holdings sold by a defendant, (2) the number of defendants who sold stock, and (3) the difference between stock sales during the relevant time period and prior activity. *See, e.g., Malin v. Ivax Corp.,* 17 F.Supp.2d 1345, 1360–61 (S.D.Fla.1998); *Acito v. IMCERA Group,* 47 F.3d 47, 54 (2d Cir.1995) (stating that sale of stock by one outside director, in light of absence of sales by other defendants, did not give rise to strong inference of scienter); *In re Cypress Semiconductor Sec. Litig.,* No. 96–1843–CIV, 1992 WL 394927, at *2–3 (N.D.Cal. Sept. 23, 1992) (no inference of scienter where three defendants sold small percentage of stock and fourth defendant sold none of his significant holdings).

Here, the only Defendant who sold any stock during the class period was Bruce Caldwell. Caldwell sold half of his shares because he had been passed over for president of the company in favor of Roger Rosenberger. Under these circumstances,

Caldwell's sales were "consistent with normal executive departures," *In re Comshare, Inc. Sec. Litig.,* No. 96–73711–DT, 1997 WL 1091468, **9–10, 1997 U.S. Dist. LEXIS 17262, at *28 (E.D.Mich. Sept.18, 1997), and, therefore, are not particularly significant. Moreover, none of the individual Defendants who are alleged to have engaged in the fraud with Caldwell sold any of their shares. As the court held in *Comshare,* the CEO and CFO "would have been essential participants in any [fraudulent] scheme, thus their having sold no stock undermines any suggestion of knowledge on the part of defendants due to the other [inside] sales." *Id.,* 1997 U.S. Dist. LEXIS 17262, at *29, 1997 WL 1091468, *10. Finally, on April 3, 1995, after the March 30, 1995 announcement but before the May 3, 1995 announcement, one of John Alden's directors, Carl Geuther, purchased 2,000 John Alden shares in the open market. (SUF ¶ 116.) These facts are inconsistent with any inference of scienter.

### The $15 Million Adjustment to the 1994 Reserve Announced on March 30, 1995

■■■ In a May 3, 1995 press release, John Alden announced that it was taking a first quarter charge of $10 million because of a further shortfall in the 1994 Reserve based on claims received in April. Plaintiffs contend that on March 30, 1995, Defendants knew that the 1994 Reserve shortfall would be higher than $15 million and they should have recorded a higher adjustment or disclosed that a further adjustment might be required. However, there is no evidence in the record to support an inference that John Alden did anything other than record its "best estimate" of the 1994 Reserve shortfall, which is exactly what GAAP requires.

In an effort to record the best estimate of what the shortfall would ultimately turn out to be, John Alden's head of accounting performed an analysis comparing the

growth in claims per month for 1993 and 1994. (SUF ¶ 85.) Although the analysis was not actuarially based, it was thought to be a useful indicator of what the actual shortfall might turn out to be. His analysis showed that the shortfall might be as low as approximately $12 million. *Id.* In light of this analysis, John Alden arrived at $15 million as their best estimate of the shortfall. (SUF ¶¶ 86, 87.) These undisputed facts indicate to this Court that John Alden has demonstrated a reasonable basis for its decision to record $15 million and it would be inappropriate to ask a jury to second-guess that decision. *Centex*, 1994 WL 269734.

### The October 27, 1994 Press Release

■ On October 27, 1994, John Alden issued a press release announcing its 1994 third quarter earnings. In the release, John Alden announced that it was experiencing an increase in medical claims that was adversely impacting earnings in its Healthcare Division and that it was taking certain actions in response to the increase in claims. Defendant Johnson was quoted in the release as stating: "These actions, along with significantly increased sales and outstanding results in our Asset Accumulation segment, are keeping us on-track for an excellent year." (SUF ¶ 1.)

### A. "On-track" For an Excellent Year

Plaintiffs claim that Defendants knew on October 27, 1994 that John Alden was not on track for an excellent year and materially misled the public when it made such a claim. Such general statements of optimism, however, with no guarantee of results, are generally considered to be immaterial as a matter of law and therefore not actionable.[9] This is especially true where, as here, Plaintiffs have offered no evidence that Defendants lacked a reasonable basis for the statement.

Plaintiffs claim that in early 1994, Defendants knew John Alden could not earn $3.65 per share. They cite to the fact that John Alden's Compensation Committee reduced the earnings target for management bonuses from $3.65 to $3.50 per share and rely further on several John Alden internal documents prepared in early 1994. However, Plaintiffs mischaracterize the content of those documents and ignore the deposition testimony of the authors of the documents and other John Alden employees.[10]

---

9. *See In re VeriFone Sec. Litig.*, 784 F.Supp. 1471, 1481 (N.D.Cal.1992), *aff'd*, 11 F.3d 865 (9th Cir.1993); *In re Syntex Corp. Sec. Litig.*, 855 F.Supp. 1086 (N.D.Cal.1994), *aff'd*, 95 F.3d 922 (9th Cir.1996) (company's statement that it "expected a very strong fiscal 1993" immaterial); *Raab v. General Physics Corp.*, 4 F.3d 286, 289 (4th Cir.1993) (statement that "the [rest] of the 1992 [year] should be in line with analysts' current projections" immaterial); *Hillson Partners L.P. v. Adage, Inc.*, 42 F.3d 204, 212 (4th Cir.1994) (statements "1992 will produce excellent results" and the company was "on target toward achieving the most profitable year in its history" immaterial); *Bentley v. Legent Corp.*, 849 F.Supp. 429, 432 (E.D.Va.1994), *aff'd*, 50 F.3d 6, 1995 WL 115879 (4th Cir.1995) ("on plan" or "on target" immaterial); *Alfus v. Pyramid Technology Corp.*, 745 F.Supp. 1511, 1519 (N.D.Cal. 1990) ("vague expressions of optimism as to future performance" immaterial); *In re Cypress Semiconductor Sec. Litig.*, 891 F.Supp. 1369, 1376 (N.D.Cal.1995) (prediction of "improvement" in 1992 earnings immaterial); *Searls v. Glasser*, 64 F.3d 1061, 1067 (7th Cir.1995) ("loose predictions" immaterial); *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1446 (5th Cir.1993) (predictions of future growth which are "not worded as guarantees" immaterial).

10. Plaintiffs rely on a March 17, 1994 memorandum authored by John Alden's then CFO, J. Calvin Winter, (Cera Ex. 19), in which they claim he "warns the Defendants in writing that failing to revise their plan calling for this 3.65 per share, will be quote, 'a suicidal exercise in self-deception.'" (Oral Arg. Tr. 35–36.) The document, however, reflects Mr. Winter's observation that it would be "a suicidal exercise in self-deception" for John Alden to measure its quarterly progress toward achieving "our $3.65 Operating EPS 1994

In any event, this evidence is not probative of John Alden's financial condition and prospects on October 27, 1994. John Alden's then current management information report demonstrates a reasonable basis for its statement that it was "on-track"; it was $6 million ahead of its business plan, it was projecting a shortfall to plan of only $2–3 million if its business did not improve in the fourth quarter, and it was coming off a month in which the downturn in its Healthcare Division appeared to be reversing itself. (SUF ¶ 7.)

Contrary to Plaintiffs' claim that in the analyst conference call following its earning release on October 27, 1994, John Alden misrepresented to the public that "everything's great," John Alden made no such comments and actually painted a cau-

tious picture during the call by noting: (1) its Healthcare results were lower than expected; (2) its medical loss ratio was increasing; (3) medical claims were up; (4) price competition was increasing; and (5) the stagnation of federal healthcare legislation resulted in an increase in medical inflation and utilization. (Horowitz ¶ 129, pp.5–9.) In connection with the actions it announced it was taking in response to these factors, John Alden expressed a substantial lack of certainty as to how it will all "play out." (*Id.* at 35.) Finally, John Alden had already cautioned the market as to substantial uncertainty relating to the cyclicality of the medical insurance business and how long the current up trend would continue.[11] In response, John Alden's stock price fell by approximately 8%. (SUF ¶ 9.)

Plan goal" as if the earnings will be spread out evenly over the four quarters. The document continues to show projected earnings for the year at $3.65 per share.

Plaintiffs then point to a March 22, 1994 memorandum from Mr. Winter, entitled "Current Shortfall Analysis to 1994 Plan," (Cera Ex. 20), in which they claim that Mr. Winter advised Defendants "that they need to revise their profit plan, the 3.65, because it's not achievable." (Oral Arg. Tr. 36.) Again, the document simply described a forecasted $.52 per share shortfall, pointed out the items causing the shortfall "early enough in the year to either correct them or compensate for them," and observed that "timely plan changes and assignments" would be required to make up the shortfall. At his deposition, in response to an inquiry as to whether he believed John Alden could make Plan, Mr. Winter responded: "I don't know that I thought it would be tough to achieve, but I didn't want to leave anybody with the impression that [it] was a cakewalk, and they wouldn't have to work at it." (Horowitz ¶ 137.) It is undisputed that John Alden promptly announced assignments to make up the projected shortfall. (Stanton Ex. D.)

Plaintiffs also rely on a July 5, 1994 memorandum from Glendon Johnson and Roger Rosenberger entitled "SHORT OF 1994

PLAN: YOUR HELP IS CRITICAL TO GET BACK ON TRACK." (Cera Ex. 53.) Plaintiffs portray the memorandum as describing a "crisis" situation. (Oral Arg. Tr. 44.) To the contrary, the memorandum describes a need to reduce administrative costs that is "well within our capabilities" and that would cause a "minimum of disruption to our customers and markets." In closing, the authors state: "Many of us in senior management that have weathered tough times in the past know this is a 'walk in the park' for an organization like John Alden. We haven't really buckled down for five years.... Let's all pull together over the next six months so that John Alden can meet its 1994 profit plan and earnings per share commitments."

11. In its 1993 Form 10K filed in March 1994 and in its August 1994 Prospectus, John Alden identified a number of factors that existed in 1994 that may not have existed in previous cycles and indicated that these factors appeared to have lengthened the current up cycle beyond the historical six year pattern. John Alden cautioned: "The Company cannot predict the extent to which the current cycle will be lengthened or whether these factors will cause a permanent alteration in the cyclicality of the group health insurance business." (SUF ¶ 128, p.22.)

Based on these undisputed facts, the lack of any evidence that Defendants knew on October 27, 1994 that it was not "on-track" to have an excellent year, the fact that John Alden in fact achieved its earnings target based on a reserve that had a reasonable basis, and the fact that the statement was immaterial in any event, this Court finds that Plaintiffs have not demonstrated the existence of a genuine issue of material fact whether John Alden had a reasonable basis for its statement that it was "on-track" for an excellent year.

## V. Conclusion

For the reasons stated above, it is hereby ORDERED and ADJUDGED that Defendants' Motion for Summary Judgment is GRANTED in its entirety. Pursuant to Rule 58 of the Federal Rules of Civil Procedure, the Court will enter a separate judgment.